638 P.2d 423

**Maria C. DOMINGUEZ, Plaintiff-Appellant,**

v.

**Benjamin Hatchett STONE, as an individual and as Trustee for the Village of Central, Defendant-Appellee.**

**No. 5250.**

Court of Appeals of New Mexico.

Dec. 8, 1981.

Peter A. Keys, Silver City, for plaintiff-appellant.

Karen Kennedy, Cherpelis & Nivala, Albuquerque, for defendant-appellee.

## OPINION

LOPEZ, Judge.

The plaintiff appeals summary judgment granted in favor of the defendant on her complaint against the defendant for personal damages. We reverse.

The sole issue on appeal is whether the trial court erred in granting summary judgment.

We review and discuss four causes of action which constitute the basis of plaintiff's complaint and which the trial court dismissed in its summary judgment. The four causes of action will be discussed seriatim. 1. Defamation of reputation, 2. Intentional infliction of emotional distress, 3. Violation of 42 U.S.C. § 1983, 4. Unlawful discriminatory practices under the New Mexico Human Rights Act, § 28–1–1 et seq. N.M.S.A. 1978.

Plaintiff's complaint had its genesis in events which occurred on or about September 16, 1980, in Grant County, New Mexico. The plaintiff is a 22 year-old Mexican National having been born in Mexico. She has been legally residing in the United States since she was 3 years of age and now is living in Grants, New Mexico. In 1976 she graduated from high school. Plaintiff was the director of the Senior Citizens Program in the Village of Central, New Mexico on September 16, 1980. Defendant Stone was a member of the Board of Trustees of Central which is its governing body. On September 16, 1980, during a public meeting of the Village Trustees and later during a closed meeting, or executive session of the Village Trustees, the defendant made certain statements concerning plaintiff which referred to her alienage and ethnicity. The statements were to the effect that plaintiff was not suited for her employment with the Village of Central because she was a Mexican. Defendant's statements included a statement to the effect that the person performing the duties of program director of the Village of Central Senior Citizens Program should not be a Mexican, part of his reason being that the program is funded with American tax dollars. The defendant interrogated the plaintiff at the meeting concerning payment of income and property taxes and whether she possessed a green card, whether she applied for United States citizenship, and whether she had registered to vote in the United States. On September 17, 1980, the defendant personally went to the office of the Grant County clerk to determine whether plaintiff was a registered voter. He was told she was not.

## DEFAMATION OF REPUTATION

The plaintiff's complaint alleges in paragraph 13 as follows:

13. The aforesaid misconduct defamed the Plaintiff's name and severely damaged her reputation in the community and among her employers, all to the Plaintiff's damage in an amount to be determined at trial, which sum the Defendant should be ordered to pay to the Plaintiff as compensation.

The trial court dismissed this cause of action in its summary judgment. Our duty is to review the record to determine if there exists a genuine issue of fact which could preclude summary judgment. We attach as Appendices P and D excerpts from the depositions of plaintiff and defendant, which excerpts are pertinent to our review.

The law of defamation of reputation is well established in New Mexico. Reputation is what a person is thought to be, as distinguished from character, which is what a person is. *Proper v. Mowrey*, 90 N.M. 710, 568 P.2d 236 (Ct.App.1977). Restatement (Second) of Torts, § 559, states as follows:

Defamatory Communications Defined

A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.

The question we are confronted with now is whether there is an issue of fact that any of the comments of the defendant lowered the plaintiff's reputation in the estimation of the community, third parties, or her employers, the Board of Trustees.

The defendant contends that he had some sort of immunity to act as he did because he was a member of the Board of Trustees. We disagree. Public officials are not above the law. "The law protects only those who act reasonably and with a reasonable belief of the truth of their remarks." *Salazar v. Bjork*, 85 N.M. 94, 509 P.2d 569 (Ct.App. 1973).

In defendant's brief and on oral argument, he appears to assume without any basis in the record that plaintiff could not be subjected to defamation of reputation on grounds of discrimination or prejudice because the majority of the members of the Board of Trustees and a large portion of the population of Grant County are of Spanish or Mexican descent. He further appears to assume that all Mexican-Americans, being members of this minority group, would be inclined to act fairly toward other members of the group. Thus, he asks this court to discount the possibility of any defamation of reputation. Defendant's assumptions about human nature fly in the face of a great deal of social science and research. Social scientists agree that members of minority groups frequently respond to discrimination and prejudice by attempting to disassociate themselves from the group, *even to the point of adopting the majority negative attitudes toward the minority.* Such behavior occurs with particular frequency among members of minority groups who have achieved some measure of economic or political success and thereby have gained some measure of economic or political success, and thereby have gained some acceptability among the dominant group. See concurring opinion of Justice Marshall in *Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977).

There is evidence in the record from which a jury could conclude that the defendant was prejudiced against the plaintiff and that he was attempting to persuade the Board of Trustees to accept his views and attitudes towards the plaintiff. There is an issue of fact of defamation of reputation in this respect.

It is common knowledge in New Mexico that the word "Mexican" when used in circumstances similar to those in the instant case connotes prejudice and disparagement. It is also common knowledge in this State that, like defendant, many citizens of Mexican and Spanish descent also served in the armed forces, and some gave their lives for this country. Hardly an Hispanic family in New Mexico escaped the anguish of the Bataan Death March in World War II; Hispanics have served bravely in other conflicts as well.

We are not impressed with defendant's contention that because plaintiff is an alien,

she should not be employed in Grant County. President Franklin D. Roosevelt, in an address to the Daughters of the American Revolution in 1938, said: "Remember, remember always, that all of us, you and I especially, are descended from immigrants."

We hold that the court erred in granting summary judgment in respect to this cause of action.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

In paragraph 16 and 18 of plaintiff's complaint she alleges:

Paragraph 16:

As a direct and proximate result of the Defendant's wrongful acts alleged herein the Plaintiff was caused great grievous mental suffering, anguish and anxiety and suffered severe shock to her nerves and nervous system and suffered other injuries, the exact nature and extent of which are yet unknown.

Paragraph 18:

The defendant's misconduct was done with malice and with reckless disregard for the harm it would do to the Plaintiff; the defendant should be ordered to pay to the plaintiff exemplary or punitive damages in an amount to be determined at trial, and her reasonable attorney fees.

The trial court dismissed this cause of action. We have reviewed and previously incorporated in this opinion excerpts from the depositions of plaintiff and defendant which pertain to this cause of action and which we refer to at this time.

This court recognized the tort of intentional infliction of emotional distress, called the law of outrage, by the plaintiff in *Mantz v. Follingstad*, 84 N.M. 473, 505 P.2d 68 (Ct.App. 1972). The court quoted the pertinent section from Restatement (Second) of Torts § 46 (1965) as follows:

(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

(2) Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress

(a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or

(b) to any other person who is present at the time, if such distress results in bodily harm.

Under Comment (c), it is stated that "the law is still in a stage of development, and the ultimate limits of this tort are not yet determined."

Comment (d), entitled "Extreme and outrageous conduct" reads in part as follows:

The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice", or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Comment j of Restatement (Second) of Torts, § 46 (1965), reads as follows:

*Severe emotional distress.* The rule stated in this Section applies only where the emotional distress has in fact resulted, and where it is severe. Emotional distress passes under various names, such as mental suffering, mental anguish, mental or nervous shock, or the like. It includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, humiliation, embarrassment, anger, chagrin,

disappointment, worry, and nausea. It is only where it is extreme that the liability arises. Complete emotional tranquility is seldom attainable in this world, and some degree of transient and trivial emotional distress is a part of the price of living among people. The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it. The intensity and the duration of the distress are factors to be considered in determining its severity. Severe distress must be proved; but in many cases the extreme and outrageous character of the defendant's conduct is in itself important evidence that the distress has existed. For example, the mere recital of the facts in Illustration 1 above goes far to prove that the claim is not fictitious.

The distress must be reasonable and justified under the circumstances, and there is no liability where the plaintiff has suffered exaggerated and unreasonable emotional distress, unless it results from a peculiar susceptibility to such distress of which the actor has knowledge. See Comment f.

It is for the court to determine whether on the evidence severe emotional distress can be found; it is for the jury to determine whether, on the evidence it has in fact existed.

We discuss here an identical case to the case at bar:

The court in *Contreras v. Crown Zellerbach Corp.*, 88 Wash.2d 735, 565 P.2d 1173 (1977), held that the Plaintiff had sufficiently stated a cause of action under the tort of outrage as defined by the Washington courts and the Restatement (Second) of Torts, § 46 (1965), where it was alleged that the plaintiff, while in the employ of the defendant corporation, was subjected to intentional or reckless conduct on the part of the defendant's agents and employees *which was beyond all reasonable bounds of decency and which caused him severe emotional distress* by reason of acts of intimidation, demotions, humiliation in public, and exposure to scorn and ridicule, when the defendant's agents knew or should have known that by reason of the *plaintiff's Mexican nationality and background he was particularly susceptible to emotional distress as a result of the conduct.* Noting that liability under the tort of outrage has been recognized in Washington when premised upon outrageous conduct such as alleged in the present case; the Court pointed out that *when one in a position of authority over another allegedly made racial slurs and jokes and comments, this abusive conduct gives added impetus to the claim of outrageous behavior, the relationship between the parties being a significant factor in determining whether liability should be imposed.* The Court stated that *where a person is not free to leave* but must remain in physical proximity to others who continually make racial slurs and comments, it is for the jury to determine whether this is a factor in making the claim one of extreme outrage and *the extent to which the employer was or should have been aware of these conditions through its supervisory personnel or by other means.* The Court further observed that as to the various slang epithets that may have once been in common usage regarding Mexican-Americans, *it was for the trier of fact to determine, taking into account changing social conditions and the plaintiff's own susceptibility, whether the particular conduct was sufficient to constitute extreme outrage.* (Emphasis added.)

■ We believe and hold, that the testimony of the plaintiff and the defendant which we have quoted in this opinion heretofore and all the evidence in the record do establish that an issue of fact does exist as to this cause of action. The trial court erred in granting summary judgment based on this cause of action.

VIOLATION OF § 1983.

■ In paragraph 22 of Count II the plaintiff alleges:

The aforesaid misconduct by the defendant consitutes a denial of the plaintiff's rights guaranteed by the equal protection clauses of the Fourteenth Amend-

ment to the United States Constitution and of Article II, Section 13 of the New Mexico Constitution; by 28–1–27 NMSA (1978 Comp.) called the Human Rights Act; by 42 USCS Section 1981; and 42 USCS Section 1983.

42 U.S.C. § 1983 provides that:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Nowhere does plaintiff allege or present any facts of a deprivation of any particular right, privilege, or immunity secured by the state or federal constitutions or laws, by anyone acting under color of statute, or otherwise. Absent some such deprivation, a cause of action will not lie under § 1983. *Stringer v. Dilger*, 313 F.2d 536 (10th Cir. 1963).

Summary judgment was proper in respect to this count.

## UNLAWFUL DISCRIMINATORY PRACTICE UNDER NEW MEXICO HUMAN RIGHTS ACT

Section 28–1–1 et seq. N.M.S.A. 1978.

Plaintiff alleges a cause of action under § 28–1–7 of the New Mexico Human Rights Act. This section only defines unlawful discriminatory practices. Section 28–1–10(A), N.M.S.A. 1978 (Cum.Supp.1981), sets out the procedure for initiating an action for unlawful discriminatory practice. Note procedure followed in *Linton v. Farmington Municipal Schools*, 86 N.M. 748, 527 P.2d 789 (1974). There is no indication in the record that plaintiff followed that procedure by filing a complaint with the Human Rights Commission within ninety days of the alleged unlawful discriminatory act. It appears that plaintiff attempted to bypass her administrative remedies altogether and initiate an action for unlawful discriminatory practice in district court.

■ We do not discuss the propriety of plaintiff's procedure because we lack subject matter jurisdiction to review actions for unlawful discriminatory practices under the Human Rights Act. Section 28–1–13, N.M.S.A. 1978, states in part:

A. Any person aggrieved by an order of the commission may obtain a trial de novo in the district court of the county where the discriminatory practice occurred or where the respondent does business, by filing a notice of appeal within thirty days from the date of service of the commission's order.

   \*     \*     \*     \*     \*     \*

C. \* \* \* The jurisdiction of the district court is exclusive and its judgment is final, subject to further appeal to the supreme court.

This provision limits review of the district court's judgment to the New Mexico Supreme Court. Therefore, even if plaintiff had properly pursued her administrative and trial court remedies, this court has no authority to review a judgment of the district court on this issue.

Summary judgment was proper in respect to this count.

In the interest of justice we recommend that Judge Hughes recuse himself and allow the Supreme Court to appoint another trial judge. If the plaintiff cannot get a fair trial in Grant County, a change of venue should be considered.

The judgment of the trial court is reversed and the cause is remanded for proceedings consistent with this opinion.

Appellate costs are to be paid by the appellee.

IT IS SO ORDERED.

WALTERS, C. J., and SUTIN, J., concur.

## APPENDIX D

Excerpts from defendant's deposition:

Q. Where are you employed, Mr. Stone?

A. Self-employed.

Q. What's the name of your company.

A. Stone Construction.

Q. Your a contractor?

A. That's right

Q. So I take it you wouldn't disagree with me, would you, if I suggested that, based upon your previous answers, you appear to be fairly conscious of ethnic differences between you and other Council members; is that right?

A. Yes, I do.

Q. And you think of the other Council members as being Spanish American in your own mind. When you think of their ethnicity, it's Spanish American?

A. Yes.

Q. And that's what you thought Maria Dominguez was prior to the meeting on September 16, 1980; isn't it?

A. Yes.

Q. You didn't realize she was Mexican?

A. No.

Q. And that day, September 16, was the first day you had learned that she was Mexican?

A. Yes.

Q. How long before the meeting, itself, did you read the form that we've now been referring to and noticed that she was Mexican?

A. I read it that night. It was handed to me.

Q. At the meeting?

A. Yes.

Q. And so your reaction at that time was, included among other things, one of surprise?

A. Yes.

Q. How else did you feel besides surprised at reading that or learning that information.

A. I don't know what you're talking about.

Q. What other emotions did you experience when you read that besides one of surprise?

A. I felt disturbed. I felt like that we had five Spanish persons there, and they were working under an alien. And I felt hurt.

Q. Why did you feel hurt by that information, or disturbed?

A. I feel like this is the United States of America. And the jobs here are for our citizens. That's the way I feel about it.

Q. And that's the way you felt about it as of September 16, 1980?

A. I felt like that all of my life, on any jobs, I feel this way. I feel like if somebody wants to live here, become a citizen. That's great. But I feel like if they're here to receive our benefits in our great country, and they don't want to become a citizen, I think they should go to their own country. That's my feeling.

Q. So, I take it you, in effect, then, disagree with certain immigration laws that grant aliens the right to be here under certain circumstances; is that right?

A. Not necessarily.

Q. Assuming, for the sake of this next question, that it is lawful for Ms. Dominguez to be in the country and working, I take it you disagree with the spirit of such a law, if there were such a law; is that right?

A. Yes. I feel like, if we have a government here in our little town to run, I don't think aliens should be supervisors or running it. I feel like this is the United States of America and citizens of our country should run it. If you'll look around we have quite a problem with aliens right now.

Q. What do you mean by that?

A. Cuba, Mexico, Thailand, Iran; I can just keep on going.

Q. When you say, "We have problems with those"—with what? I realize we have certain international problems with different countries. But as it pertains to people from those countries being here, you're saying we're experiencing problems with those people?

A. Yes, sir.

Q. And you lump Ms. Dominguez along with those other people we are having problems with.

A. She's an alien, she's an alien. I can't change it.

Q. All aliens, from your point of view, then, we have this sort of problem with them being here; is that right?

A. I don't know about the others. All I can do is refer to her. Like for instance, what's bothering bad is, like the Cuban crisis. We've got people in Albuquerque right now that can't speak English and they're stealing from their next door neighbor. It's on national TV.

We've people in Florida that are paying taxes and having to support all of these people. And I don't think this right, for taxpayers to support people that are over here—

I think that our money should be used for a better purpose.

I have nothing against Maria Domingues. I feel like, just like I said before, it there's a supervisory capacity job in Central, New Mexico, it should be held by a citizen of the United States of America.

Q. Do you think she should be removed from her position becaus of citizenship, her present citizenship?

A. I feel that way, yes, sir. I feel that this is the good old United States of America, and the people that citizens should be running it. Yes, sir. I feel this way.

Q. Would you agree with me that its fair to say that, at some point in the meeting on September 16, 1980, that you—whatever words you actually used—that you, in effect, conveyed your idea to the Council conveying your feelings about aliens working in a position such as Maria Dominguez was working in? Is that right?

A. That's right.

Q. You did that publicly, right?

A. If it's a closed meeting, I don't think it's any of your business. That's not on the record. That's a closed meeting. We discussed it in there, and that's all I'll tell you about it.

Q. In that case, if you will be so kind as to tell me what you remember, I'll be grateful.

A. I asked the question what it meant.

Q. Right.

A. And then, when I went from there, I said, "I feel like that anybody that works for the City of Central should be a citizen and especially if she's over five American citizens. I think one of them should be the director. And if there is any jobs left, she might be one of the lower on the totem pole, but not the director.

Q. What else do you remember having said at that meeting?

A. I asked her if she could vote. I asked if she had a green card. I asked her working status, is what I asked her first. I said, "May I ask you, what is your working status and do you have a green card?

Q. What do you mean by "working status", Mr. Stone?

A. Always, I have understood, that you have to have some kind of working permit from the federal government to be in here if you are not a citizen, to work. In other words, a card that you had the right to be here and be able to be a gainful employee.

Q. What was the purpose of your asking that question?

A. I was curious to the fact whether or not she had a card. I felt if she did not meet the United States standards, she shouldn't have the job.

Q. What else did you ask at that meeting?

A. I asked her if she was a property owner.

Q. Why did you ask her that?

A. I felt like it had some reference to the situation, due to the fact that I said that I thought tax dollars from the United States citizens were paying these bills. And I felt like—did she own property? Did she pay taxes? That was the object of asking her. I really didn't know if she owned property or not, and I still don't know. I really don't know.

I think a citizen's rights, he has all the rights and all the privileges of the United States of America. And I don't figure that an alien, if he's not of this country—he doesn't have any rights over here.

Q. No rights at all?

A. No. I think he ought to go home.

Q. So you don't think Maria Dominguez has any rights in this country, because she's an alien?

A. That's right. I sure don't.

Q. After the meeting on September 6, did you make any efforts whatsoever to gain any more information at all pertaining to Maria Dominguez?

A. Yes, sir.

Q. What efforts did you make?

A. I went to the Courthouse, and I asked if she was a bona fide voter. And they looked it up and said no.

APPENDIX P

Excerpts from Plaintiff's Deposition:

Q. What comments were made to you at that meeting by Mr. Stone?

Q. I'm asking for all comments made to you by Mr. Stone at that Board of Trustees meeting as best you recall.

A. Can I refer back to my notes?

Q. Let me ask you a question first: Did you read a copy of the minutes of that meeting of September 16, 1980?

A. Yes, I did.

Q. Did you agree that the minutes contained an accurate description of what was said at that meeting concerning your citizenship? You can look at them, if you like.

A. I did read them, but I would have liked for them to have been worded exactly the way it happened, verbatim. And I do have my notes from that meeting. And a couple of my friends were here taking notes that day. And its more or less what happened, but I think that it makes a big difference how words are said.

Q. So you're saying that the minutes do not reflect the exact words that were spoken, but the minutes contain a summary of what happened at that meeting?

A. Yes.

Q. Maria, let's go through your notes and the minutes and compare them. And will you tell us everything that you have in your notes that you recall happened that aren't reflected in the minutes. And then, when we get through with that, I assume we're going to know exactly what happened at that meeting. Okay?

A. Okay. Do you want me to go ahead and read you my notes?

Q. No. I want you to look at your notes and look at the minutes and tell us anything that you have that was missing from the minutes, including verbatim, according to your notes.

A. In the minutes of September 16, 1980, where it says, "Trustee Stone stated that, in looking over this affirmative action plan"—where it says "It states 'Maria C. Dominguez, director, female, Mexican,' asked her what this meant exactly."

And in my notes, it was, "In looking at the affirmative action plan, it says here 'Maria C. Dominguez, director, female, Mexican'—Mexican, huh. What does that mean exactly?"

Q. I'm sorry, if you could continue.

A. Also in the minutes, where it says, "Trustee Stone stated that he was on the Board and was one of her supervisors," and in my notes, I have, "Don't forget, I'm on the Board and one of your supervisors." And he did stress that. "Don't forget." "Trustee Stone inquired if she had a green card authorizing her to work, if she had applied for citizenship, or was a registered voter. Ms. Dominguez stated she did not have to answer his questions."

In my notes, I've got Mr. Stone asking, "What do you have, a little green card?" And he went on to point it out, "What do you have, a little green card for employment? Have applied for citizenship and to vote in the United States? By the way, how long have you lived here? And he did ask me that.

And then I did go on to tell him that I did not have to answer his questions.

Q. That's reflected in the minutes, isn't it?

A. Yes. And in the minutes, it says, "Trustee Stone stated that he was a citizen of this country, was a veteran, and this was his country."

My notes read, "As a citizen and veteran of this country, this is my country." That's exactly how he did say it. And he did point at his chest. The minutes read, "There are five Americans here and he felt that the director of any program that is funded through the U.S. tax dollars should not be Mexican, but an American citizen."

And my notes read, "Let's see"—and he picked up the affirmative action plan. And he said, "Let's see. We've got here—oh, yes," he said, "we've got five Americans here. And I feel the director should not be Mexican. Monies for this program are American tax dollars." Exactly. That's as best I can recall for now.

Q. And what you have said has been everything that happened at the meeting, is that correct?

A. Yes, as best as I can recall. This is from the time the Senior Citizens' Program came up. Okay? This isn't any comments that I heard before. This is just it.

Q. The September 16th meeting?

A. Yes.

I did hear other comments before this took place. I mean, it was during the meeting.

Q. What comments did Mr. Stone direct to you or make about you at the meeting of September 16, 1980?

A. What I just said was what he directed to me. And there was also an Executive Session, which I heard a lot of what was going on, because Mr. Stone's voice was extremely loud. The meeting started. And when they broke into Executive Session, we were asked to leave the meeting room, which is right here next door. So we got up, and went in to City Hall.

Q. Did you take notes of what was being said?

A. Yes, I did. (Emphasis ours at the Executive meeting) The witness was outside.

Q. Then, why don't you tell us what they contain.

A. It was, "She's a Mexican, You see her? She's a Mexican." And he was loud. He kept saying, "That is not fair. There's no way. Why should she be employed? She's a Mexican. She's a Mexican."

He kept on and on and on. And I could hear the trustees in in there saying, "That's discrimination." To the best of my recollection now, that is what kept going on and on and on. And I kept hearing, "She's a Mexican. She's a Mexican."

In fact, I was ready to be called in to the Executive Session.

Q. What do you mean you were ready?

A. Because I thought they going to call me in there, because Mr. Stone was really upset over the fact that I was a Mexican.

Q. Were you called in to the meeting?

A. No, I wasn't not in to the Executive Session. But like I say, I was just waiting.

Q. Now, we have discussed comments that you overheard from the Executive Session of September 16, 1980, and we discussed comments that were made during the regular meeting of the council on 9/16/80. Now, I would like you to tell us if you heard any comments after the 9/16/80 meeting made about you or to you from Mr. Stone?

A. Yes.

That following Wednesday, which was the 17th of September I was told by—

Q. By who?

A. By the clerk and assistant clerk.

Q. That would have been Ms. Baca and Ms. Chavez?

A. Yes. That Mr. Stone had commented that he still believed that I should not be director, because I was Mexican.

Q. Did they tell you that this comment had been made by Mr. Stone to the two of them?

A. Yes.

Q. Could you tell us once more what those comments were that he allegedly made to them?

A. That he still felt he was right, and he wasn't going to go back on his word, that he didn't think I should be director.

Q. The question was any comments that were allegedly made by Mr. Stone concerning you which some third person would have told you about later. Do you understand the question?

A. Yes. I had been told so much.

Q. Could you explain what, if anything, happened to you after this 9/16/80 meeting in relationship to your job? Did you miss any days at work?

A. No.

Q. Did you feel ill?

A. Very ill. Very nervous. Very uptight. Going to the chiropractor.

Q. And when did you go see him?

A. I see him very, very often, to today.

Q. How many times did you see Dr. Lehman?

A. Just once.

Q. His diagnosis was muscle tension, is that correct?

A. Muscle tension.

Q. Did he suggest any further treatments?

A. He prescribed to me a painkiller.

Q. Do you remember exactly what Mr. Stone said about property taxes.

A. It was when he said that I should not be director, because I was Mexican and they were American tax dollars. When I went on to tell him that I also pay taxes, and I told him that I would like to get my check in a lump sum with no deductions. And he told, "You don't pay property taxes." And I told him, "Yes, I do."

Q. Were there any other statements that Mr. Stone made that falsely stated anything concerning you?

A. Other than what he was saying was that the fact that I was Mexican, just the fact that I was Mexican, that I was not capable of carrying on my job.

Q. What exactly did he say.?

A. When he kept saying that I was Mexican, and that there was five other employees, and I should not be the director, because I was Mexican. In other words, he felt—

Q. Is there anything else?

A. This is from what he was directing to me. This isn't at the Executive Session. This is what I said was what he told me. At the Executive Session, he said I should not be director, because I was Mexican. In other words, he felt I couldn't do the work, because I was Mexican. He felt I should let the custodian replace me, because she was American and I should be cleaning.

Q. How much have you paid your attorney in this lawsuit?

A. $1,045.

Q. Have you received the funds to pay him from anyone besides yourself?

A. I paid every penny of it.