Warren BOUIE, Plaintiff–Appellee,

v.

AUTOZONE, INC., a Delaware
corporation, and Dan Gomez,
Defendants–Appellants.

No. 90–2194.

United States Court of Appeals,
Tenth Circuit.

March 24, 1992.

Charles H. Hollis (Robert A. Bogdan,
with him on the brief), of Kullman, Inman,
Bee, Downing & Banta, New Orleans, La.,
for defendants-appellants.

Steven Granberg, Albuquerque, N.M.,
for plaintiff-appellee.

Before: HOLLOWAY, SETH and
TACHA, Circuit Judges.

SETH, Circuit Judge.

Warren Bouie brought this suit against
his former employer AutoZone, Inc. (Auto-
Zone) and his former supervisor Dan Go-
mez asserting five causes of action based
on racial discrimination by AutoZone.
However, the only cause of action at issue
on appeal is Bouie's claim for intentional or
reckless infliction of emotional distress un-
der New Mexico law. A jury awarded
Bouie $16,120 in compensatory damages
and $150,000 in punitive damages on the
claim.

Appellants AutoZone and Gomez argue
that the district court committed legal er-
ror by concluding that reasonable minds
might differ on whether the conduct at
issue was outrageous as that term is de-
fined under New Mexico law. This error,
Appellants claim, led to the improper denial
of their motions for summary judgment,
directed verdict, and judgment notwith-
standing the verdict. In the alternative,
Appellants contend that the jury award
was excessive and warranted remittitur or
a new trial. For the reasons that follow
we find that AutoZone and Gomez were
entitled to judgment n.o.v., and, therefore,
we reverse.

In reviewing the denial of Appellants'
motions, we consider the facts and the in-
ferences from those facts in the light most
favorable to the non-moving party—War-
ren Bouie. *See Zimmerman v. First Fed.
Sav. and Loan Ass'n*, 848 F.2d 1047, 1051
(10th Cir.1988).

Bouie is an African–American male. He
was hired by Auto Shack, AutoZone's
predecessor, on October 14, 1986 as a parts
salesman at one of Auto Shack's Albuquer-
que stores. When he applied for the job,

Bouie had five years of experience in the sale of auto parts.

AutoZone is a Delaware corporation duly licensed and authorized to do business in New Mexico. The company specializes in the sale of auto parts.

Appellant, Dan Gomez, is a Hispanic male who resided in Alabama when this lawsuit was filed. Gomez worked as both an AutoZone store manager and area advisor in the New Mexico region while Bouie was employed with the company. In this capacity he had supervisory authority over Bouie. Bouie's employment at AutoZone lasted just under a year. He was fired for a stated cause unrelated to this appeal.

Bouie heard from other employees that Gomez several times had referred to him as a "nigger" or "lazy-assed nigger," and that Gomez stated he was not afraid to fire "niggers." These racial slurs by Gomez and other AutoZone employees formed the basis of Bouie's claim for reckless infliction of emotional distress and are the focus of this appeal. The slurs were never made directly to Bouie nor in his presence nor within his hearing.

Coworkers of Bouie testified that they had heard Gomez use racial slurs when referring to Bouie, the only African–American working in the Albuquerque AutoZone stores. One witness, Frank Ortega, worked at AutoZone about five months in 1987 as an assistant manager and as a manager. Ortega testified that both Gomez and the district manager, Gary Weedameyer, used racial slurs when referring to Bouie, and he testified that Weedameyer told him "[w]e need to take care of the nigger." Ortega also stated that Gomez told him on several occasions that "Warren was lazy, he was a lazy nigger. And, you know, he [Gomez] needed—he [Gomez] wanted to get rid of him." The witness stated that Gomez told him to have Bouie do busy work such as stacking oil rather than working in sales, the position for which he was hired. Ortega was ultimately fired by Gomez. He testified that he was appearing on behalf of Bouie because he realized he made a mistake by not reporting the racial slurs made by Gomez and Weedameyer. However, during cross-examination he stated that he never talked to Bouie about the racial slurs.

The second coworker of Bouie to testify was Ralph Mora. He worked at AutoZone for ten months in 1986–1987 as an assistant manager and as a manager. Mora testified that Gomez twice referred to Bouie as a "nigger" and at one point stated "he had to get rid of that lazy-ass nigger, no matter whether he would get the whole NAACP after him." During his direct testimony, Mora stated that on two or three occasions he told Bouie about Gomez's statements. On cross-examination, however, he stated that he told Bouie once. Mora testified that he told him because he believed Bouie was a good employee and wanted to warn him to be careful of Gomez. Mora eventually left the company after he was demoted by Gomez.

A third employee, Rod Ferriera, testified that Gomez often used the word "nigger" but only once when referring to Bouie. After it had been decided to fire Bouie (October 1987), Ferriera testified he overheard Gomez state: "We got that nigger, that nigger's gone." Ferriera also testified that he never told Bouie what Gomez said. Ferriera worked as the parts sales manager until he was demoted.

The final coworker to testify was Lawrence Akard. His job at AutoZone was to travel between the Albuquerque stores assisting younger inexperienced employees in the auto parts business. He worked at AutoZone until June 20, 1987. During this time, he testified that he heard Gomez use the word "nigger" when referring to Bouie "several times, ten or more." He also heard Gomez say "some people may be afraid to fire a nigger, but I'm not." Akard testified that he told Bouie about the statements once or twice to alert him that Gomez was out to get him.

During the cross-examination of Bouie, he confirmed that Mora and Akard told him that Gomez referred to him as a "nigger." Bouie acknowledged, however, that Gomez never directly called him a "nigger." Bouie stated that Gomez often stared at him and referred to him as "Hoss" or

"Bud" rather than by his first name or Mr. Bouie. When Bouie objected to the use of "Hoss" and "Bud" Gomez stopped.

Bouie testified that the knowledge that Gomez, a minority, would refer to him as a "nigger" caused Bouie to withdraw into himself, lose his appetite, and lose sleep. He also began to question and distrust other people. Bouie told some of his co-workers that he was hurt by Gomez's words and actions. Bouie did not, however, seek medical attention or miss work. He also did not mention the racial slurs in three separate statements given to the Equal Employment Opportunity Commission.

After his discharge, Bouie filed a five-count suit in district court against AutoZone and Gomez. The court's jurisdiction over the federal claims was based on 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. § 2000e. The court had pendent jurisdiction over the state claims. Bouie alleged: (1) a violation of 42 U.S.C. § 1981; (2) a violation of Title VII of the Civil Rights Act; (3) breach of contract; (4) intentional and negligent infliction of emotional distress; and (5) fraudulent and negligent misrepresentation. The district court granted AutoZone and Gomez's motion for summary judgment on causes one, three, and five; however, the court found sufficient disputed material facts to allow the Title VII and intentional infliction of emotional distress claims to be tried. Both claims were tried simultaneously although only the infliction of emotional distress count was submitted to the jury. The Title VII claim was dismissed by the judge and is not the subject of this appeal.

■ Our review focuses on the district court's denial of Appellants' motion for directed verdict and judgment notwithstanding the verdict. Both motions are reviewed *de novo* applying the same standard used by the district court. *See Guilfoyle v. Missouri, Kansas & Texas R.R. Co.*, 812 F.2d 1290, 1292 (10th Cir.1987). "The district court errs in denying the motion 'only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party for whom the jury

found.'" *Heyen v. United States*, 945 F.2d 359, 362 (10th Cir.1991) (quoting *Zimmerman v. First Fed. Sav. & Loan Ass'n*, 848 F.2d 1047, 1051 (10th Cir.1988)).

■ As mentioned, Bouie testified that Gomez never directly referred to him as a "nigger." Gomez did call Bouie directly "Hoss" and "Bud," but Bouie testified that he did not equate a racial meaning to these terms. Bouie only learned of Gomez's use of the racial slurs secondhand from two of his coemployees.

Neither party cites a single state or federal case where recovery under the tort of intentional or reckless infliction of emotional distress has been allowed for racial slurs which are repeated by a third party to a plaintiff. While Appellee argues that some of the slurs in *Dominguez v. Stone*, 97 N.M. 211, 638 P.2d 423 (App.1981), were made behind closed doors and later repeated to the plaintiff, *Dominguez* is distinguishable from the present facts because direct slurs were also made.

Instead, as mentioned, some of the witnesses who heard the words, testified that they described the remarks made about Bouie to him at another time and place. Some witnesses who also heard the words did not repeat them to Bouie. The reason for the difference is not indicated.

On this appeal we must hold that the evidence provided no basis for a cause of action for outrageous conduct under New Mexico statutes or under New Mexico case law (or case law elsewhere). This is for the reason that the racial slurs relied on were not made to the plaintiff by the defendants, nor in his presence, nor within his hearing.

There is no basis for the legal conclusion made by the trial court that secondhand statements are actionable. There are no decisions by New Mexico courts which suggest such a doctrine, and there is nothing in the Restatement (Second) of Torts, which the New Mexico courts often cite, to support such a conclusion.

With the emphasis in the opinions and in the textbooks on the requirement of a "high degree of probability that emotional distress would follow," *see Salazar v.*

*Furr's Inc.,* 629 F.Supp. 1403 (D.N.M. 1986), and Restatement (Second) of Torts § 46, there must be added here as an element thereof the high degree of probability that the slurs would be repeated.

The circumstances of time, place, and listeners of the quoted statements are not described to give some measure as to whether or not they were made in a loose definition of "confidence" which could prevent the "high degree of probability" of repetition within the "high degree of probability that emotional distress would follow." We must follow what the state law is or what it might be, and in the silence on this matter we are not prepared to make any new doctrine on this record as a whole which in our view would be a significant departure.

Obviously, the slurs however or wherever made cannot be condoned in the workplace, as here, in the supervisory relationship, or under any circumstances.

IT IS ORDERED that the judgment of the United States District Court for the District of New Mexico is REVERSED, and the case is REMANDED for entry of judgment n.o.v. for Appellants.

HOLLOWAY, Circuit Judge, dissenting:

I respectfully dissent.

Our question is whether the evidence that plaintiff Warren Bouie presented at trial is within the parameters recognized by New Mexico for the tort of outrageous conduct and intentional or reckless infliction of emotional distress. I respectfully disagree with the majority opinion because I believe Bouie presented evidence that was sufficient, under both the New Mexico decisional law and § 46 of the *Restatement (Second) of Torts,* which the New Mexico courts have embraced, for the district judge to submit to the jury, as he did, Bouie's pendent state claim of reckless infliction of emotional distress, and to leave the jury's verdict for Bouie standing. Accordingly, I would affirm because I am convinced the district court correctly denied the defendants' motions for a directed verdict and for judgment n.o.v. on Bouie's claim.

### I

I turn first to the record evidence. The underlying question is whether the jury properly could have reached a verdict in favor of the nonmoving party. *E.g., Rajala v. Allied Corp.,* 919 F.2d 610, 615 (10th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1685, 114 L.Ed.2d 80 (1991). There is error in a district court's denial of a judgment n.o.v. "only if the evidence points but one way and is susceptible to no reasonable inferences supporting the party for whom the jury found; we must construe the evidence and inferences most favorably to the nonmoving party." *Zimmerman v. First Fed. Sav. & Loan Ass'n,* 848 F.2d 1047, 1051 (10th Cir.1988).

Bouie began working for the Auto Shack automotive parts stores in Albuquerque in October 1986.[1] Bouie, who had almost five years of experience in delivering and selling auto parts, was assigned first to work as a full-time salesperson at an Auto Shack store located on Central Avenue. The then-assistant store manager, Ralph Mora, Jr., described Bouie as a "good employee" who was "reliable" and "always on time" and who was "real good with customers" and knowledgable about the auto parts business. II R. 100–02. Bouie testified that even though he was hired to sell merchandise he spent much of his working time outdoors pulling weeds or "sweeping the front of the store or in the back of the store stacking oil." *Id.* at 198.

In early December 1986, Bouie was transferred to an Auto Shack store located on Fourth Street in Albuquerque. Frank Ortega recalled that when he began working at the Fourth Street location in mid-April of 1987, the store manager was complaining about Bouie's job performance. Ortega, then the assistant store manager, recalled that he worked with Bouie for three or four weeks and "had no problem with him." II R. 71–72.

---

1. AutoZone, Inc., is the successor in interest to Auto Shack. I R.Doc. 49, at 3. During Bouie's employment with the firm, the stores were named Auto Shack. *Id.*

Ortega said two of his supervisors used racial slurs in the course of complaining to him about Bouie. Ortega testified that the district manager, Gary Weedameyer, complained to him about Bouie during a discussion related to Ortega's promotion to store manager, stating, "We need to take care of the nigger." II R. 73. At the time, Ortega was attending administrative training in Phoenix. Ortega said he replied that he had not had any problems with Bouie. Ortega quoted Weedamayer as saying, "We may take care of that problem for you before you get back." *Id.* Ortega recalled hearing defendant Gomez, first a management trainee and later the area advisor, refer to Bouie as a "nigger" or "lazy nigger" on at least three or four occasions. *Id.* at 75, 81.[2] Ortega said he did not report to Bouie that Gomez had used the racial slurs. *Id.* at 82.

In May 1987, Bouie was transferred back to the Central Avenue store. Mora, the store manager, said when he began the process of requesting a raise for Bouie, Weedameyer told him to "go ahead and do the paperwork, but make sure that I had a real low score in order for him not to get a raise." II R. 104. Mora said he followed Weedameyer's instructions concerning the requested raise.

Mora recalled that on about two occasions, Gomez referred to Bouie as a "nigger." II R. 105–06, 117. Mora quoted Gomez as having stated that "he had to get rid of that lazy-ass nigger, no matter whether he would get the whole NAACP after him, no matter what, he was going to get him out." *Id.* at 105. Mora said that Gomez told him "in so many words ... that I had to get him out." *Id.* Mora was the first co-worker to report to Bouie that Go-

mez was using racial slurs about Bouie. Mora testified that he repeated Gomez' racial slurs *to Bouie. Id.* at 106. Mora said he told Bouie on one occasion "that he was referred to as a nigger, a lazy-ass nigger, and be careful of Mr. Gomez." *Id.* at 120–21.

Lawrence T. Akard, Sr., who helped train newer Auto Shack employees, testified that he heard Gomez refer to Bouie as a "nigger" on possibly 10 or more occasions. II R. 161–62. Akard said Gomez "made the remark several times that he was going to get rid of this nigger, and 'some people may be afraid to fire a nigger, but I'm not.'" *Id.* at 162. Akard testified that *he reported to Bouie "several times"* that Gomez was making racial slurs, including the word "nigger." *Id.* at 168, 175–76 (emphasis added). Akard said he told Bouie on one or two occasions that "Mr. Gomez had a problem with black people, and he was out to get him, there was no doubt about it." *Id.* at 162.

In addition, Bouie testified that he heard reports from co-workers *"at least once every other week"* that Gomez was using racial slurs to describe Bouie. II R. 200–01 (emphasis added).[3] Bouie said after hearing the first report he felt "very, very bad on the inside," and lost sleep that night. *Id.* at 201. Bouie testified also that he became withdrawn and felt ashamed. *Id.;* III R. 19. Bouie said he could not understand why a member of another minority group—Gomez—would use racial slurs against him. II R. 201. Bouie said he did not consult a physician, psychiatrist, or social worker about his "hurt and shame." III R. 14–15.

---

**2.** Ortega quoted Gomez as making statements to the effect that

> Warren was lazy, he was a lazy nigger. And, you know ... he wanted to get rid of him.... [T]hose were some of the comments that he made to me, that plus make sure you keep him busy, you know, just busy work ... I felt that Warren should be selling instead of stacking oil, which is what they had him doing a lot of the time when I first started working.

II R. 75.

**3.** Bouie recalled that he probably received the first report that Gomez was referring to him

with racial slurs from Mora in May 1987. III R. 13–14. Bouie said about two weeks later he received a similar report from Akard. *Id.* at 16. Bouie said that in about June 1987, a third co-worker, Ricks, reported to him that Gomez was referring to him with racial slurs. *Id.* at 18.

Bouie said he could not recall other dates upon which co-workers reported to him that Gomez, in referring to him, used racial slurs. In all, *Bouie testified that he received "several" reports from each of the co-workers. Id.*

Following his transfer to a third Auto Shack store, Bouie was fired in October 1987.[4] Another salesperson, Ferriera, testified that soon after Bouie was dismissed he overheard Gomez make a statement to the effect that, "We got that nigger, that nigger's gone." II R. 141, 152.

The defendants disputed much of Bouie's evidence. At trial, Gomez denied that he used racial slurs when referring to Bouie. III R. 162. There was some testimony that all sales personnel were required to perform the tasks that Bouie was assigned. *E.g., id.* at 251–52. However, the defendants' contradictory testimony merely created factual issues on these points and the jury apparently accepted Bouie's version.

Thus there was ample evidence that Gomez on numerous occasions used the most extreme racial epithets about Bouie and that these slurs were repeatedly relayed to Bouie. There was also the proof that Weedameyer, the district manager, used the slur about Bouie. Thus, within the recognized parameters of the tort, there was reckless repetition of the slurs in circumstances where reporting of them to Bouie could reasonably be expected. That was the very thing that happened over and over, completing the proof of the tort.

## II

The majority holds that the evidence "provided no basis for a cause of action for outrageous conduct" because "the racial slurs relied on were not made to the plaintiff by the defendants, nor in his presence, nor within his hearing." *See supra* p. 877. I cannot agree with this conclusion because it incorrectly assumes that such recklessly made slurs, although reported to a plaintiff and causing him or her severe emotional distress, are not actionable under § 46 unless made in the plaintiff's immediate presence and hearing.

The New Mexico courts have adopted the exact terminology of § 46. *See Newberry v. Allied Stores, Inc.,* 108 N.M. 424, 773 P.2d 1231, 1239 (1989); *Dominguez v. Stone,* 97 N.M. 211, 638 P.2d 423, 426 (App. 1981). The language of § 46 does not support the majority's restrictive reading requiring immediate physical presence.[5] Section 46(1) imposes liability in broad terms for extreme and outrageous conduct, including verbal conduct, that intentionally *or* recklessly causes severe emotional distress. Section 46(2) imposes a requirement of physical presence of the plaintiff *only* in the case of actionable conduct "directed at" a third party.

Decisional law, both in New Mexico and other jurisdictions, does not, in my judgment, impose an *immediate presence* requirement. For example, in *Trujillo v. Puro,* 101 N.M. 408, 683 P.2d 963, 969 (App.1984), it was held that a plaintiff stated an adequate cause of action under the principles of § 46, as adopted in New Mexico. There the court noted that the substance of the cause of action alleged was as follows:

Plaintiff alleged defendant intentionally included false statements in plaintiff's hospital records; that defendant failed to note in his office records a telephone call received from plaintiff; and that defendant testified falsely, denying receipt of the telephone call. Although the alleged false swearing before the medical review commission by defendant cannot subject

---

4. The reason for Bouie's firing was the subject of another cause of action, a Title VII claim, that is not at issue in this appeal.

5. Section 46 provides:
   § 46. Outrageous Conduct Causing Severe Emotional Distress
   (1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

(2) Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress
   (a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or
   (b) to any other person who is present at the time, if such distress results in bodily harm.
Restatement (Second) of Torts § 46, at 71–72 (1965).

defendant to civil liability (NMSA 1978, § 41–5–20(E) (Repl.Pamp.1982)), *plaintiff's allegation of defendant's false and intentional entry in the hospital records is sufficient to preclude a motion to dismiss on this claim.*

683 P.2d at 969 (emphasis added).

Obviously, the plaintiff in *Trujillo* had to learn of the entry into the hospital records either by reading it subsequently or by having the contents repeated to him, causing the emotional distress. Thus, New Mexico imposes no immediate presence requirement for a claim of intentional infliction of emotional distress.

Although it was decided under Colorado law, our opinion in *Malandris v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 703 F.2d 1152, 1166 (10th Cir.1981), *cert. denied*, 464 U.S. 824, 104 S.Ct. 92, 78 L.Ed.2d 99 (1983), is pertinent with respect to whether presence or direct contact between a defendant and plaintiff is required for such a tort under § 46. In *Malandris*, after discussing a Third Circuit opinion, we stated that: *"The absence of the plaintiff during the tortious conduct was irrelevant in that case just as it is here. In both situations the plaintiff was the party most likely to suffer emotional distress upon learning of the defendant's actions." Id.* at 1166 (emphasis added) (citing Restatement (Second) of Torts § 46 illus. 15, 16). We rejected a presence requirement in *Malandris*, saying that "[w]e cannot agree with the defendant that the absence of direct contact between Barron (the account executive) and the plaintiff precludes liability in these rather unusual circumstances...." *Id.* at 1166.

In *Malandris* there was evidence that the account executive had avoided consulting the plaintiff before making unauthorized transactions in her account, knowing that the transactions were directly contrary to her wishes, and that he convinced the plaintiff's husband to misrepresent the facts to her. The gist of the cause of action was conduct in the *absence* of plaintiff, but under circumstances in which she was the party most likely to suffer emotional distress, as she was found to have done.

Again, in *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1274 (3d Cir.1979), statements made in the absence of the plaintiff were held actionable. A physician made statements to the press that the plaintiff was suffering a potentially fatal disease, even though he was aware that this was untrue. Dissemination of the falsehood in this manner was upheld as a cause of action under the principles of § 46. The Third Circuit stated: "[R]eckless conduct causing emotional distress renders an actor as liable as if he had acted intentionally." *Id.* at 1275. The court noted that "the natural and probable consequences of making the statement were that it would become known to Chuy and that such awareness would cause him emotional distress." *Id.* at 1275 (footnote omitted). There, as here, reckless conduct in the absence of the victim, but causing him emotional distress, was within the area of protection of § 46.

Lastly, I note that one of the decisions the drafters of § 46 of the *Restatement* relied upon, *Bielitski v. Obadiak*, 61 D.L.R. 494, 495, 497 (Sask.K.B.1921) (Can.), is most pertinent. The case is cited in the *Restatement (Second) of Torts* Appendix at page 48. The drafters found that the case came within the principles of § 46. The plaintiff there recovered for distress resulting from the indirect quotation of a speaker's statements.[6]

---

**6.** In *Bielitski*, a woman sought damages from a man who circulated a false rumor that her son had hanged himself. 61 D.L.R. at 495, 497. The mother of the man rumored to be dead heard the story fourth-hand, not directly from the defendant. *Id.* at 495. The plaintiff claimed that upon hearing the rumor she "suffered a violent shock and became ill." *Id.*

I view the drafters' reference to *Bielitski*-type liability as relevant because the case illustrates two of the issues in Bouie's appeal—whether the defendant may be held liable for verbal statements repeated indirectly and whether the statements were reckless. In his seminal article describing the development of the tort, Judge Magruder wrote that the court that decided *Bielitski* had concluded that the "defendant must have intended the report to reach the mother." Calvert Magruder, *Mental and Emotional Disturbance in the Law of Torts,* 49 Harv.L.Rev. 1033,

On the basis of the New Mexico decisions, the wording of § 46 which they embrace, and the other cases applying § 46, I am firmly convinced that an immediate presence requirement is not mandated so as to bar recovery by the plaintiff here.

## III

I recognize that the New Mexico decisions have not covered a factual situation precisely like this. In such circumstances, we are called upon to make our best judgment as to how the New Mexico courts would rule, based upon information including "state court decisions, decisions of other states, federal decisions, and the general weight and trend of authority." *Armijo v. Ex Cam, Inc.*, 843 F.2d 406, 407 (10th Cir.1988); *see also, e.g., Delano v. Kitch*, 663 F.2d 990, 996 (10th Cir.1981) (explaining intermediate state court decisions controlling unless state supreme court would decide otherwise), *cert. denied*, 456 U.S. 946, 102 S.Ct. 2012, 72 L.Ed.2d 468 (1982); *City of Aurora v. Bechtel Corp.*, 599 F.2d 382, 386 (10th Cir.1979) (explaining dicta and holdings in analogous state court decisions may be persuasive).

I believe that under the framework of the existing New Mexico decisions, as well as § 46, the trial judge properly submitted Bouie's evidence on the claim to the jury. Under § 46, a trial judge plays an important role in screening actions for minimum legal sufficiency. A plaintiff bringing an action under § 46 must establish that as a matter of law a jury reasonably could find that the alleged conduct: (1) was "so extreme and outrageous as to permit recovery," *Salazar v. Furr's, Inc.*, 629 F.Supp.

1403, 1411 (D.N.M.1986) (quoting Restatement (Second) of Torts § 46 cmt. h), and (2) caused severe emotional distress, *Dominguez*, 638 P.2d at 427 (quoting Restatement (Second) of Torts § 46 cmt. j). In addition, a plaintiff must establish that the complained of conduct was intentional or reckless. I am persuaded that Bouie presented evidence that was sufficient to satisfy all these requirements.[7]

The New Mexico courts in applying § 46(1) have recognized, as potentially extreme and outrageous conduct, ethnic slurs or other forms of verbal ethnic disparagement by persons who have authority over a plaintiff in an employment relationship. *Dominguez*, 638 P.2d at 427. In *Dominguez*, the New Mexico Court of Appeals considered both the ethnic nature of the comments made about the plaintiff and the fact that "when one in a position of authority over another allegedly made racial slurs and jokes and comments, this abusive conduct gives added impetus to the claim of outrageous behavior, *the relationship between the parties being a significant factor in determining whether liability should be imposed.*" *Dominguez*, 638 P.2d at 427 (emphasis changed) (quoting *Contreras v. Crown Zellerbach Corp.*, 88 Wash.2d 735, 565 P.2d 1173, 1176 (1977)); *see also* Restatement (Second) of Torts § 46 cmt. e, at 74 (1965) [hereinafter Restatement] (explaining actionable conduct may arise from abuse of the actor's position of authority over the plaintiff).

Bouie presented evidence that persons in a position of authority over him in his employment had repeatedly made racial slurs about him to other employees, the

---

1047 (1936). Judge Magruder's noted article is cited in the comments to § 46. Restatement (Second) of Torts § 46 cmt. d., at 73 (1965).
  *Bielitski* also illustrates the cases in which courts, in the absence of evidence of intentional conduct, have imposed liability on the basis of conduct that is "wilful, wanton, or reckless in its deliberate disregard of a known high degree of risk" of mental distress. W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 12, at 64 & n. 96, 65 (5th ed. 1984).

**7.** I have analyzed the case under a standard statement of the essential elements of an action under § 46(1): "(1) the conduct must be ex-

treme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe." *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1273 (3d Cir.1979), *cited with approval in Malandris v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 703 F.2d 1152, 1158 (10th Cir.1981), *cert. denied*, 464 U.S. 824, 104 S.Ct. 92, 78 L.Ed.2d 99 (1983). Though not found in the New Mexico decisions, this statement of the elements closely follows § 46. The instructions here covered these elements and the defendants had no objections to the charge. IV R. 41, 96.

situation recognized in *Dominguez*. The statements about Bouie were even more extreme and outrageous than the statements at issue in *Dominguez*. Based upon *Dominguez* and other cases fitting comfortably within § 46 principles, I would hold that the district judge decided correctly that the racial slurs spoken about Bouie by two of his superiors at work could reasonably be found to be extreme and outrageous conduct, as the jury did. Under the guidelines of § 46, "[w]here reasonable minds may differ the jury must decide whether the conduct 'is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Salazar*, 629 F.Supp. at 1411 (quoting Restatement (Second) of Torts § 46 cmt. d).

The commentary to § 46 explains that the "distress must be reasonable and justified under the circumstances." Restatement § 46 cmt. j, at 78. In addition, the nature of the defendant's conduct "is in itself important evidence that the distress has existed." *Id.* It is reasonable to find that an African–American, repeatedly made the object of such extreme racial slurs, in conjunction with an effort to prompt his or her dismissal from a job, would suffer mental distress. As a result, I am convinced that the trial judge had an adequate basis for deciding that a jury question existed as to whether Bouie's mental distress was severe.

The district court submitted the evidence to the jury solely under the theory that one of Bouie's supervisors, Gomez, recklessly inflicted distress upon him. IV R. 41 (listing court's instructions to jury). The commentary to § 46 explains that the term "recklessness" means conduct that is in "deliberate disregard of a high degree of probability that the emotional distress will follow." Restatement § 46 cmt. i; *see also* Restatement § 500 (definition of reckless).

In sum, the record demonstrates that a sufficient showing was clearly made by Bouie for recovery by him under New Mexico law and the *Restatement*. Accordingly, I must dissent from the denial of that recovery to Bouie.