Chinonyerem OSUAGWU, Plaintiff,

v.

GILA REGIONAL MEDICAL CENTER; Jean Remillard, M.D.; Gregory Koury, M.D.; Michael Sergeant, M.D.; Mark Donnell, M.D.; Ronald Deyhle, M.D.; Don White, Defendants.

No. 11cv001 MV/SMV.

United States District Court, D. New Mexico.

Feb. 25, 2013.

Chinonyerem Osuagwu, Albuquerque, NM, pro se.

Candace J. Cavanaugh, Butt Thornton & Baehr PC, Albuquerque, NM, for Defendant Gila Regional.

Kevin J. Banville, Seth Sparks, Shannon Sherrell, Rodey, Dickason, Sloan, Akin & Robb, P.A., Albuquerque, NM, for the Individual Defendants.

### ORDER DENYING MOTIONS TO DISMISS and GRANTING and DENYING SUMMARY JUDGMENT IN PART

MARTHA VÁZQUEZ, District Judge.

**THIS MATTER** is before the Court on Defendant/Physicians Jean Remillard's, Gregory Koury's, Michael Sergeant's, Mark Donnell's, and Don White's joint *Motion to Dismiss*, filed August 1, 2012 [Doc. 123], brought under Federal Rule of Civil Procedure 12(b)(6); on their joint *Motion for Summary Judgment*, filed November 12, 2012 [Doc. 168] [1]; and on that part of pro se Plaintiff Dr. Chinonyerem Osuagwu's Motion for Summary Judgment seeking judgment against these Defendants filed August 23, 2012 [Doc. 135]. I will also address the arguments the individual Defendants presented in their cross-motion for summary judgment filed on October 9, 2012 [Doc. 160]. I temporarily bifurcated both the Plaintiff's motion for summary judgment and the Defendants' cross-motion for summary judgment for the purposes of resolving Docs. 135 and 160 as to Gila Regional only, and granted summary judgment in favor of Plaintiff and against Gila Regional on Plaintiff's § 1983 claims for violation of his due-process rights. *See* December 21, 2012 Memorandum Opinion and Order ("Opinion") at 1 (Doc. 198). I have also recently dismissed Defendants Sergeant, Donnell, and Deyhle from this case, *see* February 25, 2013 Opinion (Doc. 215), and will not address any arguments related to them that are now moot.

The individual Defendants seek dismissal of Plaintiff's federal claims brought pursuant to 42 U.S.C. § 1983 based on alleged expiration of the statute of limitations, and,

---

1. The individual Defendants filed a cross-motion for summary judgment in Doc. 160 based in part on qualified immunity, and then filed a second motion for summary judgment on the basis of qualified immunity, incorporating the same facts and arguments of Doc. 160, in Doc. 168. This double-briefing of the same issue violates the rules and places a heavy burden on the Court and on the pro-se litigant, and the Court could *sua sponte* strike it.

except for Dr. Remillard, seek dismissal of Plaintiff's state-law claims for the same reason. They also contend that Plaintiff fails to state a claim against any Defendant for violations of state law. All Defendants also assert qualified immunity on the contention that it is not clearly established Supreme Court or Tenth Circuit law that Plaintiff had a constitutionally-protected property interest in his guaranteed-income contract and medical privileges granted by Gila Regional Hospital. Having considered the parties' submissions, the record, and the applicable law, I will deny the Defendants' motions in part and grant them in part, and will grant Plaintiff's motion in part and deny it in part.

## I. Procedural Background.

Plaintiff sued Gila Regional and several individuals under 42 U.S.C. § 1983 for damages and injunctive relief, alleging violation of his due-process rights, defamation, and intentional infliction of emotional distress. He alleges that Gila Regional, through the actions and conduct of Don White (the Chairman of its Board of Trustees); Dr. Jean Remillard (its Chief Medical Officer); the individual members of its internal Peer Review Committee ("PRC"); the members of its Medical Executive Committee ("MEC"); the members of its Fair Hearing Committee ("FHC" or "panel"); and Ronald [Deyhle], an Outside Peer Reviewer, violated his civil rights when, without a reasonable belief that their actions were warranted by known facts, without a reasonable effort to obtain facts, and without following the process due to Plaintiff, the MEC and Board of Trustees temporarily and then indefinitely suspended his medical privileges and imposed harsh requirements for regaining those privileges, and Dr. Remillard filed notice of that adverse action with the National Practitioner Databank and the New Mexico Medical Board. Plaintiff also contends that the Defendants have tortiously damaged his reputation and intentionally inflicted emotional distress. *Osuagwu v. Gila Reg'l Med. Ctr.,* 850 F.Supp.2d 1216, 1219 (D.N.M.2012) (Doc. 94) (footnote omitted).

The Plaintiff filed his original Complaint on January 3, 2011, and he filed an Amended Complaint as a matter of right on January 10, 2011. *See* Docs. 1, 7. The first Scheduling Order permitted Plaintiff "to join additional parties and amend the pleadings" by July 13, 2011. June 28, 2011 Scheduling Order at 1 (Doc. 39). On July 13, 2011, Plaintiff filed a motion to amend his Amended Complaint to add the individual Defendants as additional parties, attaching a copy of the proposed Second Amended Complaint. *See* Doc. 43. Gila Regional objected. I did not rule on this motion, however, until February 24, 2012. As I noted in granting the motion to amend,

Plaintiff's allegations included claims that Defendant Gila Regional Medical Center, through the actions and conduct of the Chairman and another member of its Board of Trustees, individual members of its internal Peer Review Committee, members of its Medical Executive Committee ("MEC"), and members of the Fair Hearing Committee and an Outside Peer Reviewer, violated his civil rights. But the only specific names mentioned in the Amended Complaint were Jean Remillard, who was Gila Regional's Chief Medical Officer, *see* Doc. 7 at ¶¶ 62, 70; Dr. Donnell, the Hearing Officer who presided over the "Fair Hearing," *id.* at ¶ 67; Dr. Donald Montoya, a member of the Board of Trustees, *see id.* at ¶ 80; and Mr. Baca, the Chairman of the Board of Trustees, *see id.* at ¶ 89. In the first amended complaint, Plaintiff stated that he may de-

sire to substitute these individuals and/or others as named defendants in another amended complaint when he discovered more information....

After the parties engaged in discovery, Plaintiff filed his motion to substitute named defendants for the John and Jane Does and to state additional facts in support of his claims. Gila Regional opposes the motion, contending that amendment would be futile because it and the individuals who participated in the decisions leading to the withdrawal of the Plaintiff's medical privileges at Gila Regional and to filing notice of its adverse actions against Plaintiff with the National Practitioner Databank and the New Mexico Board of Medical Examiners are immune from suit under the Health Care Quality Improvement Act (HCQIA), 42 U.S.C. §§ 11101–11152.

Feb. 24, 2012 Opinion at 1–2 (Doc. 86). All of the individual Defendants, except for Dr. Deyhle, are either officers of Gila Regional, or served on the various committees and Boards of Gila Regional referenced in the Amended Complaint. A week after I granted the motion, Plaintiff formally filed his Second Amended Complaint. *See* Doc. 90. Plaintiff filed returns indicating that he served all of the new Defendants by April 21, 2012, and the Court issued a new Scheduling Order on May 24, 2012. *See* Doc. 113. The parties have engaged in additional discovery, which ended on November 19, 2012. The Court recently granted the individual Defendants' untimely motions to amend their answers to add an additional affirmative defense. *See* December 10, 2012 Order (Doc. 191).

## II. Undisputed material facts.

The parties have submitted additional documentation into the record. None of the documentation, with a few exceptions discussed in my December 21, 2012 Opinion, calls into question the undisputed facts, findings, and conclusions set forth in the March 27, 2012 Opinion, the December 21, 2012 Opinion, and the February 25, 2013 Opinion, thus I adopt and incorporate those facts, findings, and conclusions. The undisputed facts relevant to the issues raised in the Defendants' motions to dismiss and for summary judgment at bar are as follows.

Plaintiff had a written contract to provide OB/GYN medical services to Gila Regional for two years, beginning February 15, 2008, with a guaranteed income of at least $265,000/year, which could only be terminated either by mutual consent or "for cause-specified." Doc. 162, Ex. GGG at 1. As a necessary adjunct of the contract, Gila Regional granted medical privileges to Plaintiff, *see* Doc. 160 at 13, ¶ 3, and both parties agreed to be bound by Gila Regional's Bylaws, which included mandatory procedures for physician discipline or suspension of privileges, *see id.* at 14–15, ¶ 10. Under the Bylaws, if the MEC made a recommendation that could permanently adversely affect a physician's clinical privileges, the Board could not take action on the recommendations "until after the procedural rights provided in Art. VIII have been provided." Doc. 162–1 at 10 ¶¶ 7.1–6, Ex. JJJ.....

. . . .

Critically, section 7.2–1 of the Bylaws provides that, if the MEC summarily suspended a physician, the suspension would "automatically expire if not at the end of fourteen (14) days extended by action of the MEC pursuant to [subsection 7.2–2]." Doc. 162–1 at 10, ¶ 7.2–1. Subsection 7.2–2 mandated the MEC to "interview the practitioner affected by the summary suspension," within 5 days of that suspension and to inform him of its specific basis, including a written statement and summary "of at least one or more particular incidents giving rise

to the assessment of imminent danger" "demonstrating that failure to suspend could have reasonably resulted in an imminent danger to the health of an individual," and giving the practitioner "an opportunity to discuss, explain, or refute the facts that made the basis of the suspension." *Id.* at 10–11, ¶ 7.2.2. As noted previously, the MEC never gave Plaintiff an opportunity to explain or comment on those two incidents, in violation of the Bylaws. *See* Doc. 160 at 4, ¶ 4. In its notice to Plaintiff, the MEC only referred to two unspecified "diagnostic laparoscopi[c] procedures recently performed by you," and informed him that "[t]hese incidents will be investigated by the Peer Review Committee." Doc. 57, Ex. 1. The letter informed Plaintiff that "this time frame is not a reportable event." *Id.*

December 21, 2012 Opinion at 6–7, 9–10 (Doc. 198).

I found that Gila Regional, acting through its MEC, of which Dr. Koury was both a voting member and for which he temporarily served as the head for a period of time; its PRC, of which Dr. Koury was the head and Dr. Remillard also served as an investigating and voting member; its FHC, on which Dr. Remillard served in a quasi-judicial capacity and as prosecutor and witness, and its Board of Trustees, which was headed by White,

> violated Plaintiff's rights to due process by: (i) extending the November 17, 2008 summary suspension, which had expired by operation of the Bylaws; (ii) imposing harsher, extended suspensions on November 24, 2008, without first making a finding that Plaintiff had ever placed patients in imminent danger, or giving Plaintiff predeprivation notice of the charges against him; and (iii) reporting

the adverse action to the New Mexico Medical Board, based on suspensions that had automatically expired under operation of the Bylaws. Further, the Court finds that Gila Regional Medical Center, through its MEC, Board, and FHC, violated Plaintiff's due-process rights in the post-deprivation proceedings by (i) allowing Dr. Remillard to serve as accuser, investigator, prosecutor, and judge and; (ii) refusing to produce the reviewers and other physicians who had accused, or allegedly had accused, Plaintiff of substandard medical practices. Finally, the Court finds that the Board violated Plaintiff's post-deprivation due-process rights by: (i) considering evidence against which Plaintiff was never given the opportunity to defend or dispute, including at least two cases and Dr. Montoya's opinion as an expert; (ii) failing to rule on the FHC's recommendations to reject the MEC's November 24, 2008 recommendations, which had expired; and (iii) adopting the MEC's December 29, 2008 recommendations for suspension, which Plaintiff was never allowed to challenge through any process, and which had no support in the evidentiary record.

*Id.* at 34–35.

In my February 25, 2013 Opinion, I found on undisputed documentary evidence

> that the MEC expressly limited the PRC investigation to laparoscopic procedures on November 17, 2008, and it expressly found that Plaintiff's surgical skills did *not* need to be investigated. *See* Doc. 160-6. Dr. Remillard and Dr. Carreon, both members of the PRC, were at that meeting. *See id.* Nevertheless, Dr. Remillard, Dr. Koury, Dr. Carreon, and Dr. Montoya[2] unilaterally

---

**2.** At the hearing, Dr. Remillard was vague in testifying that "probably four or five" physicians engaged in the review of over 30 of

Plaintiff's patients' records, Doc. 44–2 at 9, but all reviewers remained anonymous on the evaluation sheets they filled out.

reached out to investigate not only the Plaintiff's laparoscopic-surgical patients's records, but to examine 32 more records that also involved general surgery and obstetric patients, without obtaining authority to do so.

Feb. 25, 2013 Opinion at 8. As set forth in the February 25, 2013 Opinion,

I have previously found it undisputed that

Dr. Remillard attended the MEC meetings [despite the fact that Gila Regional's Bylaws did not provide for or allow the CMO to attend those meetings]; ... was a voting member of, and served as an "expert witness" for, the PRC; ... served as the prosecuting individual on behalf of the MEC and as an unsworn witness at the fair hearing; and ... served as a voting member of the quasi-judicial FHC at the fair hearing.

December 21, 2012 Opinion at 7 (Doc. 198); Doc. 160 at 13 ¶ 6 (listing the members and individuals authorized to attend the MEC meetings, which do not include the CMO). Surely, the CMO of a hospital should be familiar with its Bylaws and would understand that he could not represent the MEC and be both witness and judge against a physician in a "fair hearing," and it would be reasonable for a jury to infer bad faith and malice from Dr. Remillard's repeated decisions to disregard the Bylaws. I have also noted that, despite the fact that Plaintiff was never given the due process required in the Bylaws, and Plaintiff's two temporary suspensions had automatically expired by December 8, 2008 under operation of the Bylaws because of the MEC's failure to follow them, *see* December 21, 2012 Opinion at 13, and before the FHC had filed its decision to recommend rejection and modification of the MEC's November 24, 2008 summary suspension, "on December 17, 2008, Dr. Remillard wrote to the New Mexico Board of Medical Examiners to inform them of the suspensions of Plaintiff's privileges. Doc. 44, Ex. Q." March 27, 2012 Opinion at 29.

I have also previously noted, after comparing the undisputed facts presented at the fair hearing and Dr. Remillard's December 29, 2008 testimony to the MEC summarizing those facts, that "it is impossible to see how, under the undisputed evidence presented at the [fair] hearing, Dr. Remillard could fairly tell the MEC that Plaintiff did not properly handle the complications caused by Dr. Nwachuku's surgery." December 21, 2012 Opinion at 18. In my Opinion denying Gila Regional's motion for summary judgment on the issue whether it and its agents and entities were immune from liability on Plaintiff's claims under HCQIA, on undisputed facts, I found:

On March 4, 2009, Dr. Remillard submitted a report to the National Practitioner Data Bank, informing it of the Board's February 2, 2009 final "indefinite" suspension and reduction of clinical privileges. Doc. 44, Ex. G (44–1 at 2–5). But there are errors in Dr. Remillard's report, the most negative being that he erroneously stated that the results of "an outside peer review of selected cases" contributed to the Board's decision to taking its final adverse actions. *Id.* at 2. As the basis for the Board's action, Dr. Remillard also cited "substandard or inadequate skill level," "immediate threat to health or safety," and "substandard or inadequate care," *id.* at 3, when there has never been a final finding made by an expert, the Board, the MEC, or the FHC that, in fact, Plaintiff fell below the standard of care or that he is so incompetent that he poses an "immediate threat to health or safety." And Dr. Remillard did not check the box indicating that Plaintiff dis-

puted the report. *See id.* Plaintiff has presented compelling evidence, therefore, "for a jury to conclude [Dr. Remillard's] report was false and the reporting party knew it was false." *Brown [v. Presbyterian Healthcare Services]*, 101 F.3d [1324] at 1334 [ (10th Cir.1996) ].

March 27, 2012 Opinion at 33. There is abundant evidence for a jury to conclude that Dr. Remillard acted in bad faith and with malice when he acted and re-ported throughout these proceedings.

. . . .

. . . . [R]egarding actions taken at the December 29, 2008 meeting, in which Dr. Koury (who was at this time acting Chief of Staff and the head of the MEC) obviously voted to break a 2–2 tie among the members present, I conclude that a jury could infer bad faith and/or malice based on my prior factual summary of this meeting:

The MEC held a special meeting on December 29, 2008 to discuss the FHC's recommendations. *See* Doc. 160, Ex. B. Only five voting members were present: Drs. Koury, Carreon, Snure, Stinar, and Arizaga–Morales. *See id.* Only Dr. Carreon had attend-ed part of the fair hearing, and none of the members are OB/GYNs. Dr. Remillard presented the findings of the FHC and brought to the MEC's attention that many of the cases the PRC listed as a "5" in terms of bad outcome had been downgraded; and that Plaintiff was not the surgeon who perforated one of the patients' bowels. *See id.* . . . .

. . . . After discussion, the MEC mem-bers indicated that their concerns were: "poor documentation; the need for in-depth continuous monitoring; and the need for further education." Doc. 160[–2], Ex. B. They made no findings that Plaintiff was so incompe-tent that he was placing patients in

imminent danger. By a three-to-two vote, and despite the fact that neither the MEC, the FHC, nor any expert had ever made any findings that Plaintiff actually violated the standard of care for any patient; and, [d]espite the fact that Dr. Remillard, the only gynecologist on the FHC panel and Gila Regional's CMO, concurred in the FHC recommendations and signed off on them, the MEC sent a much harsh-er, more extensive set of recommen-dations to the Board that also affected Plaintiff's ability to practice obstetrics at Gila Regional. *See* Doc. 44, Ex. N at 1, 6. These recommendations included:

1. Suspension of all gynecologic surgical privileges

2. Obtain consultations for all ob-stetrical patients with medical or surgical complications and consulta-tions for all Special Care Unit ad-missions.

3. Send charts in question for out-side review.

4. Ongoing focused review of all obstetric patients.

5. Six hours of Continuing Medical Education of Risk Management, in-cluding education on medical record documentation.

6. Before GYN privileges reinstat-ed, additional education with regard to the indications for and techniques of all gynecological surgery and re-ceipt of information from an edu-cator that Dr. Osuagwu is compe-tent to practice in a small town. *Id.* at 1.

*Osuagwu*, 850 F.Supp.2d at 1236. The MEC gave no reasons in its min-utes for ignoring the recommenda-tions of the FHC, which was the **only** entity that had conducted a thorough review of the patient's charts and oth-

er hospital records, and the only entity that had heard Plaintiff's explanations. Nor did it give any reasons for recommending imposition of these new, extremely harsh requirements for reinstatement of privileges, the last of which, Plaintiff contends, would be virtually impossible for a licensed doctor to achieve. And this new set of recommendations contained new restrictions on Plaintiff's obstetrical practice that were never reviewed by the FHC before being sent to the Board.

December 21, 2012 Opinion at 17–19. But for Dr. Koury's December 29, 2008 vote that broke the tie in favor of the recommendations, the Board would have adopted the FHC's recommendations that the Board *reject* the MEC's November 24, 2008 suspension and requirements in favor of much less egregious ones.

Feb. 25, 2013 Opinion at 15–16. The Court is now aware of the undisputed fact that, besides being the head of the PRC and MEC (for a time), Dr. Koury was also a member of the Board of Trustees, but that he was not present for the February 4, 2009 hearing at which the Board adopted the MEC's December 29, 2008 recommendations, which Dr. Koury had submitted on behalf of the MEC. *See* Doc. 160 at 18, ¶ 25.

### III. Applicable Standards.

#### A. Motions to dismiss.

█ When resolving a motion to dismiss brought under Rule 12(b)(6), the Court accepts as true all well-pleaded factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff. The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted.

*Smith v. United States,* 561 F.3d 1090, 1098 (10th Cir.2009) (internal quotation marks omitted). The Court determines whether the complaint contains " 'enough facts to state a claim to relief that is plausible on its face.' " *Ridge at Red Hawk, L.L.C. v. Schneider,* 493 F.3d 1174, 1177 (10th Cir.2007) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The Court may "consider not only the complaint itself, but also attached exhibits." *Smith,* 561 F.3d at 1098. "Although a statute of limitations bar is an affirmative defense, it may be resolved on a Rule 12(b)(6) motion to dismiss when the dates given in the complaint make clear that the right sued upon has been extinguished." *Aldrich v. McCulloch Props., Inc.,* 627 F.2d 1036, 1041 n. 4 (10th Cir.1980).

#### B. Relation back of amended pleadings.

█ A "pleading that has been amended under Rule 15(a) supersedes the pleading it modifies and remains in effect throughout the action unless it subsequently is modified." *Gilles v. United States,* 906 F.2d 1386, 1389 (10th Cir.1990) (internal quotation marks omitted). "[T]he date on which the original pleading was filed continues to be relevant if the amended pleading relates back under Rule 15(c) ..." *Id.* (internal quotation marks omitted). Thus, Rule 15(c) controls whether an amended complaint relates back to the date of the filing of the original complaint. Rule 15(c) provides:

(c) Relation Back of Amendments.

(1) When an Amendment Relates Back. An amendment to a pleading relates back to the date of the original pleading when:

(A) the law that provides the applicable statute of limitations allows relation back;

(B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out-or attempted to be set out-in the original pleading; or

(C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:

(i) received such notice of the action that it will not be prejudiced in defending on the merits; and

(ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

FED.R.CIV.P. 15(c). "[T]he purpose of relation back [is] to balance the interests of the defendant protected by the statute of limitations with the preference expressed in the Federal Rules of Civil Procedure in general, and Rule 15 in particular, for resolving disputes on their merits." *Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538, 130 S.Ct. 2485, 2494, 177 L.Ed.2d 48 (2010). "A prospective defendant who legitimately believed that the limitations period had passed without any attempt to sue him has a strong interest in repose." *Id.* "Because a plaintiff's knowledge of the existence of a party does not foreclose the possibility that she has made a mistake of identity about which that party should have been aware, such knowledge does not support that party's interest in repose." *Id.* "The Rule plainly sets forth an exclu-sive list of requirements for relation back, and the amending party's diligence is not among them. Moreover, the Rule mandates relation back once the Rule's requirements are satisfied; it does not leave the decision whether to grant relation back to the district court's equitable discretion." *Id.* at 2496.

[T]he question under Rule 15(c)(1)(C)(ii) is what the prospective defendant reasonably should have understood about the plaintiff's intent in filing the original complaint against the first defendant. To the extent the plaintiff's postfiling conduct informs the prospective defendant's understanding of whether the plaintiff initially made a "mistake concerning the proper party's identity," a court may consider the conduct.

*Id.* at 2496–97.

## C. Summary judgment.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law."[3] FED.R.CIV.P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (noting that a summary judgment movant need not negate all the nonmovant's claims, but need only point to an "absence of evidence to support the nonmoving party's case"). The party seeking summary judgment has the

initial burden to show that there is an absence of evidence to support the nonmoving party's case. Once [the movant] meets this burden, the burden shifts to [the nonmoving party] to identify specific facts that show the existence of a genuine issue of material fact. The par-

---

3. "Rule 56 was amended, effective December 1, 2010. Under the amended rule, the standard previously enumerated in subsection (c) was moved to subsection (a), and the term genuine 'issue' became genuine 'dispute.' *See* Fed.R.Civ.P. 56 advisory committee's notes (2010 Amendments). However, the 'standard for granting summary judgment remains unchanged.' *Id.*" *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1037 n. 8 (10th Cir.2011).

ty opposing the motion must present sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, summary judgment in favor of the moving party is proper.

*Thomas v. Int'l Bus. Machs.,* 48 F.3d 478, 484 (10th Cir.1995) (internal quotation marks and citations omitted). The ultimate inquiry in a summary judgment disposition is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

"When applying th[e summary judgment] standard, [the court] view[s] the evidence and draw[s] reasonable inferences therefrom in the light most favorable to the nonmoving party." *Garrison v. Gambro, Inc.,* 428 F.3d 933, 935 (10th Cir.2005) (internal quotation marks omitted).

### D. Qualified immunity.

When a defendant asserts qualified immunity at the summary judgment stage, the burden shifts to the plaintiff, who must clear two hurdles to defeat the defendant's motion. The plaintiff must demonstrate, on the facts alleged, that (1) the defendant violated a constitutional right, and (2) the right was clearly established at the time of the alleged unlawful activity . . . . .

A constitutional right is clearly established when, at the time of the alleged violation, the contours of the right were sufficiently clear that a reasonable official would understand that his actions violate that right. . . . While the plaintiff does not have to present a case with an identical factual situation, the plaintiff must show legal authority making it apparent that in the light of pre-existing

law a reasonable official would have known that the conduct in question violated the constitutional right at issue. In determining whether a right was clearly established, we look for Supreme Court or Tenth Circuit precedent on point or clearly established weight of authority from other courts finding the law to be as the plaintiff maintains.

*Lundstrom v. Romero,* 616 F.3d 1108, 1118 (10th Cir.2010) (internal quotation marks and citation omitted); *Storey v. Taylor,* 696 F.3d 987, 992 (10th Cir.2012).

### IV. Analysis

**A. The Plaintiff's Second Amended Complaint relates back to the original filing date, thus his claims against the individual Defendants are not barred by the statutes of limitations.**

In the first motion at bar, the Defendants seek dismissal of Plaintiff's § 1983 claims and state-law claims against all individual Defendants except for Dr. Remillard, contending that

Plaintiff's claims accrued against Defendants on February 4, 2009, when the Board of Trustees at the Gila Regional Medical Center ("GRMC"), with Plaintiff in attendance, took final action against Plaintiff and withdrew his gynecologic surgical privileges. Further, on February 4, 2009, Plaintiff was well aware of Defendants' involvement in the review of his hospital privileges, which led the Board of Trustees to take the final action of revoking his gynecologic surgical privileges. The limitations period for Plaintiff's § 1983 claims ended on February 6, 2012.

Doc. 123 at 2.

■ As noted above, the allegations in the Second Amended Complaint, which was filed as an attachment to Plaintiff's motion to amend long before the statute of

limitations claimed by the Defendants expired, arose out of the same conduct, transactions, and occurrences set out in the Amended Complaint, thus satisfying Rule 15(c)(1)(C). Plaintiff named some of the individual Defendants in the body of his Amended Complaint, and referred to others who served on the various committees, and an entity such as Gila Regional can only act though the actions of its agents. Counsel for Gila Regional defended all of the individual Defendants who acted on behalf of Gila Regional in its response to the motion to amend filed in July 2011, *see* Doc. 48 at 2 (asserting that "amendments would be futile because Defendant, along with the parties Plaintiff wishes to add, are immune from suit under … HCQIA"), and in its first motion for summary judgment, *see* Doc. 57 at 1 (bringing motion "on the grounds that GRMC, and any person acting as a member of the professional review body, is immune from suit under the Health Care Quality Improvement Act (HCQIA)"). Because of these filings, it is implicit that the individual Gila–Regional employees and committee/Board members had notice that Plaintiff sought to add them as Defendants within the limitations period and authorized their defense by Gila Regional's counsel.

And, clearly, the individual Defendants were not prejudiced by the delay in filing the Second Amended Complaint as a separate document that was caused, in part, by Gila Regional's objection to permitting the Plaintiff to file his Second Amended Complaint. But for the Court's delay in granting Plaintiff's motion to amend, the Second Amended Complaint would have been filed well within the limitations period. The Court concludes that the Second Amended Complaint relates back to the date of the filing of the original Complaint and that the motion to dismiss because statutes of limitation have run must be denied.

**B. The Plaintiff has a clearly-established constitutionally-protected property interest in the contract and medical privileges that Gila Regional granted to him, and he has established that Dr. Remillard, Dr. Koury, and Don White actively participated in violating his right to due process as a matter of law.**

■ The remaining individual Defendants also seek summary judgment on the § 1983 claims, contending that they are entitled to qualified immunity and that they did not violate Plaintiff's right to due process. *See* Doc. 160 at 2; Doc. 168 at 1–2. I addressed most of the individual Defendants' arguments in my December 21, 2012 Opinion granting summary judgment in favor of Plaintiff on his § 1983 claims against Gila Regional, and I adopt and incorporate those facts and the analysis contained therein. *See* Dec. 21, 2012 Opinion at 4–6, 23–34. As discussed in that Opinion, an individual's constitutionally protected property interest in a contract for services that can be terminated only for cause (and which incorporates mandatory rules and procedures that substantively limit the discretion of a governmental entity), and in his constitutionally protected liberty interest in his professional reputation, have long been established under *Hulen v. Yates,* 322 F.3d 1229, 1240–43 (10th Cir.2003), *Watson v. University of Utah Medical Ctr.,* 75 F.3d 569, 579 (10th Cir.1996), *Benavidez v. City of Albuquerque,* 101 F.3d 620, 627 (10th Cir. 1996), *Custodio v. Parker,* No. 94–1587, 65 F.3d 178, 1995 WL 523123, *4 (10th Cir. Sept. 6, 1995), and *Le Baud v. Frische,* No. 97–6109, 156 F.3d 1243, 1998 WL 537504, *3 (10th Cir. Aug. 20, 1998).

Defendants' reliance on *Town of Castle Rock v. Gonzales,* 545 U.S. 748, 125 S.Ct. 2796, 162 L.Ed.2d 658 (2005), in arguing

that the Supreme Court has "almost certainly overruled" those cases holding that a "physician had a property interest in his medical staff privileges because the medical staff bylaws detailed a specific procedure to be applied when any physician was subject to corrective action," Doc. 166 at 6, Doc. 160 at 28–29, is misplaced for several reasons. First, the principle case to which Defendants refer in Doc. 166 (and on which I relied in part in my March 27, 2012 Opinion because it is on all fours with this case), began its analysis with the recognition of the underlying contract between the hospital and the physician.

A part of the contract was the understanding provided Dr. Horne—and all Walton County Hospital physicians with medical staff privileges—of procedural due process prior to the suspension or termination of staff privileges. The medical staff by-laws, incorporated into the Authority's by-laws, detail the procedure to be followed when corrective action against a medical staff physician is warranted. Notice and hearing within a seven day period is required when staff privileges are suspended or terminated. In addition, appellate review is provided by the Medical Staff Executive Committee, and in addition, by the Hospital Authority. Accordingly, in the present case, the contract, incorporating the medical staff by-laws, and the by-laws per se, established "the existence of rules or mutually explicit understandings," *Perry v. Sindermann,* 408 U.S. [593] at 601, 92 S.Ct. [2694] at 2699[, 33 L.Ed.2d 570 (1972) ], and sustained appellants' claim to a protected property interest.

*Northeast Ga. Radiological Assoc., P.C. v. Tidwell,* 670 F.2d 507, 511 (5th Cir.1982). Although Plaintiff did not say at his deposition that he relied on his contract and the Bylaws for his property rights, Plaintiff is a layman untrained in the law, and he is not bound by uncertain legal conclusions made at a deposition. Plaintiff did, however, produce his contract as part of the record and has always argued that he was entitled to due process because of the rights given to him in the Bylaws, which were incorporated by that contract. *See* Doc. 162 at 23–24. Thus, the Court has not ever held or suggested that Plaintiff has a property interest **solely** because he was granted medical privileges and because Gila Regional agreed to be substantively and procedurally bound by the hospital's Bylaws related to those privileges, although that, too, appears to be a correct statement in law.

Second, *Town of Castle Rock* is easily distinguished because there, the plaintiff alleged a property interest only in her procedural "entitlement to enforcement of a restraining order." 545 U.S. at 766, 125 S.Ct. 2796. The Supreme Court stated that "[s]uch a right would not, of course, resemble any traditional conception of property. Although that alone does not disqualify it from due process protection, as *Roth* and its progeny show, the right to have a restraining order enforced does not have some ascertainable monetary value, as even our *Roth*-type property-as-entitlement cases have implicitly required." *Id.* (internal quotation marks omitted). The Court then noted that, "most radically, the alleged property interest here arises incidentally . . . out of a function that government actors have always performed-to wit, arresting people who they have probable cause to believe have committed a criminal offense." *Id.* at 766–67, 125 S.Ct. 2796. The Court noted that it has previously held that "an indirect and incidental result of the Government's enforcement action . . . does not amount to a deprivation of any interest in life, liberty, or property." *Id.* at 768. *Town of Castle Rock* has no application to, and has left untouched, the analysis discussed in my prior Opinions and in cases such as the one at bar, where

the Plaintiff had a property interest with ascertainable monetary value—a $22,500/month guaranteed contract for services that were dependent upon and inextricably intertwined with medical privileges at the hospital. Further, Gila Regional's suspension action and adverse reporting directly resulted in a deprivation of that property interest and his liberty interest in his professional reputation.

The Tenth–Circuit case of *Ripley v. Wyoming Medical Center, Inc.*, 559 F.3d 1119 (10th Cir.2009), is similarly distinguishable. There, a dentist contended that a Wyoming statute **alone** gave "him a property interest *in membership* to the medical staff of Wyoming Medical Center." *Id.* at 1122 (italics added). Wyoming's statute provided that

> [a]ny hospital owned by the state ... shall be open for practice to ... doctors of dentistry ... who are licensed to practice ... dentistry ... in this state ... [p]rovided ... that these hospitals by appropriate bylaws shall promulgate reasonable and uniform rules and regulations covering staff admissions and staff privileges. Admission shall not be predicated solely upon the type of degree of the applicant and the governing body shall consider the competency and character of each applicant.

*Id.* at 1122. The Court held that the statute "does not provide Dr. Ripley with the property interest he claims, which is membership to the medical staff of Wyoming Medical Center." *Id.* at 1124. The Court also noted, however, that "the right to practice medicine at a particular hospital is a conditional property right," that is subject to the state's police power as expressed through its statutes and hospital bylaws. *Id.* at 1123–24 (quoting *Garrison v. Bd. of Trs. of Mem'l Hosp. of Laramie County, Wyo.*, 795 P.2d 190, 193 (Wyo. 1990) ("review is limited to a determination of whether the exclusion [of medical privi-

leges] was made on a rational basis, supported by substantial evidence, in accordance with reasonable hospital bylaws, and was not discriminatory, arbitrary, or capricious")). The Tenth Circuit quoted and cited *Town of Castle Rock* because, as in *Town of Castle Rock*, the Wyoming statute provided only "a procedural right without a mandated outcome, [therefore] this state-law interest is not protected under the Due Process Clause." *Id.* at 1125. In contrast, as noted, Gila Regional has given Plaintiff not only a contract for services that could not be terminated except for cause, but it also incorporated into that contract the Bylaws, which imposed mandatory and substantive limitations on Gila Regional's right to suspend or terminate Plaintiff's medical privileges.

I adopt and incorporate the analysis set forth in my December 21, 2012 Opinion regarding why the process afforded Plaintiff was constitutionally inadequate. *See* Dec. 21, 2012 Opinion at 25–34. I set forth in my February 25, 2013 Opinion the actions of Dr. Remillard, Dr. Koury, and Don White that contributed to causing the violation of Plaintiff's due-process rights. *See* Feb. 25, 2013 Opinion at 13–15, 18; *and see* Dec. 12, 2012 Opinion at 21–22 (setting forth facts regarding Board's failure to vote on the FHC's recommendations).

■ In reviewing the Defendants' response to Plaintiff's motion for summary judgment and their statement of additional undisputed facts in their cross-motion for summary judgment, I note, that the Defendants assert, and Plaintiff does not deny, that Don White did not vote on whether to adopt the MEC's December 29, 2008 recommendations. *See* Doc. 160 at 18, ¶ 27; Doc. 160–4 at 3 (minutes of Board hearing). But, as Plaintiff points out, as chairman, Mr. White improperly permitted Dr. Montoya to testify at the Board hearing and refused to allow Plaintiff to cross-

examine him; he failed to have the Board vote on the FHC's recommendation *not* to accept the MEC's November 24 recommendation; and those same minutes state that, after citing ¶¶ 8.5–8.11 [4] of the Bylaws, Mr. White expressly "asked that the Board . . . confirm the December 30, 2008 MEC recommendations," Doc. 160–4 at 2, which contained *new* recommendations for discipline and sanctions that had never been tested through the due process required by the Bylaws, in violation of those sections of the Bylaws **and** the minimal standards of constitutional due process. Therefore, the record contains undisputed facts proving that Mr. White actively invited and participated in the violation of due process, and Plaintiff is entitled to summary judgment on the § 1983 claim against him.

As a matter of law, Plaintiff has established that he had a protected property interest in his contract and medical privileges, and that he was not afforded adequate due process by Dr. Remillard, Dr. Koury, and Don White. I have already found that Dr. Remillard and Dr. Koury are not absolutely immune for their acts in unlawfully extending the PRC's investigation. *See* Feb. 25 Opinion at 8–9. As noted in my February 25 Opinion, however, if a jury finds that they or Mr. White acted in good faith in committing the other acts that caused violation of his due-process rights, they may be immune from liability.

## C. A jury could find that Dr. Remillard's actions were extreme and outrageous.

Defendants contend that they are entitled to summary judgment on Plaintiff's state-law claims for intentional infliction of emotional distress on the single contention that Plaintiff has not submitted sufficient evidence to show that their actions were extreme and outrageous. *See* Doc. 160 at 43–44 (also incorporating arguments set forth in Doc. 124 at 11–12). Because it is a state-law claim over which the Court is exercising supplemental jurisdiction, the Court must apply the substantive law of New Mexico, as expressed by the state's highest court. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 666 (10th Cir.2007).

In New Mexico, the Supreme Court adopts pattern jury instructions as the law of the state. *See State v. Parish*, 118 N.M. 39, 47, 878 P.2d 988, 996 (1994) (stating that the Court of Appeals may "amend, modify, or abolish" uniform jury instructions only when they have not been specifically addressed by the Supreme Court on appeal (internal quotation marks omitted)). To avoid summary judgment on a claim for intentional infliction of emotional distress, a plaintiff must present facts from which a jury could find that (1) the conduct in question was extreme and outrageous, (2) the conduct of the defendant was intentional or in reckless

---

**4.** As noted in my March 27, 2012 Opinion, these sections of the Bylaws provide that the MEC appoints a representative at the fair hearing, who bears the burden to "present appropriate evidence in support of the adverse recommendation," *see* Doc. 44–1 at 17–18, ¶¶ 8.5–8; that the suspended physician has the right to "challenge any witness, [and] to rebut any evidence," ¶ 8.5–9; that the fair hearing may be recessed and reconvened for the participants' convenience or for the pur-

pose of "obtaining new or additional evidence or consultation," and after all of the presentation of evidence, the hearing is concluded and closed for the purposes of deliberation "outside the presence of the practitioner," ¶ 8.5–10; that within 30 days of the adjournment of the hearing, the FHC panel prepares a recommendation for the Board of Trustees to either continue, modify, or drop the suspension, ¶ 8.5–11. *See* March 27, 2012 Opinion at 10.

disregard of the plaintiff, (3) the plaintiff's mental distress was extreme and severe, and (4) there is a causal connection between the defendant's conduct and the claimant's mental distress. The Restatement describes extreme and outrageous conduct as that which is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

*Trujillo v. N. Rio Arriba Elec. Coop., Inc.,* 131 N.M. 607, 616, 41 P.3d 333, 342 (2001) (internal quotation marks and citation omitted) (noting its adoption of Restatement (Second) of Torts § 46 (1995)); SCRA 1986 UJI 13–1628 (New Mexico's Uniform Jury Instruction setting out the elements of the tort). "Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" Restatement (Second) of Torts § 46 cmt. d. The New Mexico Court of Appeals has noted that "nonprivileged conduct that is already at the edge of outrageous may become actionable by virtue of its repetition. Under such circumstances, repetition may compound the outrageousness of incidents which, taken individually, might not be sufficiently extreme to warrant liability." *Padwa v. Hadley,* 127 N.M. 416, 423, 981 P.2d 1234, 1241 (Ct. App.1999) (internal quotation marks and citation omitted).

The Restatement also recognizes the importance of relationships: "The extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests." Restatement (Second) of Torts § 46 cmt. e; see also Restatement (Third) of Torts § 45 cmt. c ("[W]hether an actor's conduct is extreme and outrageous" depends on the facts of each case, including the relationship of the parties).

*Baldonado v. El Paso Natural Gas Co.,* 143 N.M. 288, 294, 176 P.3d 277, 283 (2007).

"As a threshold matter, the trial court should determine as a matter of law whether the conduct at issue reasonably may be regarded as so extreme and outrageous that it will permit recovery under the tort of intentional infliction of emotional distress. When reasonable persons may differ on that question, it is for the jury to decide, subject to the oversight of the court." *Trujillo,* 131 N.M. at 617, 41 P.3d at 343 (internal quotation marks and citation omitted). Simply being fired, for example, "is a common occurrence that rarely rises to the level of being 'beyond all possible bounds of decency' and 'utterly intolerable in a civilized community.'" *Id.*

But in *Dominguez v. Stone,* the Court of Appeals reversed summary judgment granted in favor of the Defendant on the plaintiff's claim for intentional infliction of emotional distress on the following facts:

Defendant Stone was a member of the Board of Trustees of Central which is its governing body. On September 16, 1980, during a public meeting of the Village Trustees and later during a closed meeting, or executive session of the Village Trustees, the defendant made certain statements concerning plaintiff which referred to her alienage and ethnicity. The statements were to the effect that plaintiff was not suited for her employment with the Village of Central because she was a Mexican. Defendant's statements included a statement to the effect that the person performing the duties of program director of the Village of Central Senior Citizens Program should not be a Mexican, part of his reason being that the program is

funded with American tax dollars. The defendant interrogated the plaintiff at the meeting concerning payment of income and property taxes and whether she possessed a green card, whether she applied for United States citizenship, and whether she had registered to vote in the United States. On September 17, 1980, the defendant personally went to the office of the Grant County clerk to determine whether plaintiff was a registered voter. He was told she was not. 97 N.M. 211, 212, 638 P.2d 423, 424 (Ct. App.1981); *see id.* at 215, 638 P.2d at 427 (holding that "an issue of fact does exist as to this cause of action").

■ It is easy to conclude that a reasonable person could find Dr. Remillard's conduct to be extreme and outrageous under the circumstances of this case. Remillard was the CMO who hired the Plaintiff and should have been interested in his (and every physician's) right to fair disciplinary procedures that permanently affect the physician's medical career. He was at the first MEC meeting when the procedural requirements of the Bylaws were discussed in regard to the automatic expiration of the suspensions, he heard the limitations of the PRC's authority to investigate (as demonstrated by his subsequent justification at the fair hearing for ignoring those limitations), and as CMO and active participant, he presumably was fully aware of the various committee's duties under the Bylaws. And yet he failed, as the CMO, to ensure that Plaintiff had an opportunity to explain his actions to the MEC; he reached out with other members of the PRC to investigate cases over which they had no investigative authority; he took over the MEC's prosecution of the case at the fair hearing when Dr. Carreon abandoned it and also served as a witness and on the quasi-judicial panel; he misrepresented facts and apparently omitted critical facts that were in Plaintiff's favor in his summary of the fair hearing presented to the MEC, and then he included clearly false statements in his reports to the National Medical Database and the New Mexico Medical Board. His intentional, repetitive, and wrongful actions against the Plaintiff are, in my view, certainly more egregious than the facts set out in *Dominguez v. Stone*, and demonstrate outrageous and extreme behavior that does not comport with our civilized society, which constitutionally ensures fair procedures before a physician's career and reputation, that he has worked for a decade to establish, is destroyed. From this evidence reasonable minds could conclude that Dr. Remillard's conduct rises to the level of being outrageous and extreme. The Court, therefore, will allow the jury to decide whether Dr. Remillard's conduct was sufficiently severe to be "atrocious and intolerable to the ordinary person." SCRA 1986 UJI 13–1628.

■ The same is not true, however, for Dr. Koury's and Mr. White's actions and communications. Neither of these individuals had the same relationship with Plaintiff as Dr. Remillard. While Dr. Koury was involved in several actions that violated due process in his capacity as coordinator of the PRC, and acting chief of staff/head of the MEC, and Mr. White repeatedly violated Plaintiff's due-process rights at the Board's hearing, those actions, they do not rise to the level of outrageousness required by the tort. Plaintiff has pointed to no other outrageous and extreme acts to support intentional infliction of emotional distress in his motion for summary judgment. *See* Doc. 135 at 18–19. As a matter of law, I conclude that Dr. Koury's and Mr. White's actions and words do not rise to the level of being outrageous and extreme and that claim will be dismissed against these two Defendants.

## D. Plaintiff has stated a cognizable claim for defamation against Dr. Remillard.

 Defendants contend, and Plaintiff does not dispute, that the basis for Plaintiff's defamation claim is Dr. Remillard's adverse action report to the National Practitioner Database. *See* Doc. 160 at, ¶ 31; Doc. 162 at 23, ¶ 24. Under New Mexico law, "defamation is a wrongful [and unprivileged] injury to [a person's] reputation." SCRA 1986, UJI 13–1001. "[A] plaintiff must first establish the prima facie case for defamation—which includes proof of actual injury to reputation—before a jury can award damages for mental anguish, humiliation, or any of the other recoverable harms listed in UJI 13–1010." *Smith v. Durden*, 276 P.3d 943 (N.M.2012). Thus, to avoid summary judgment, a plaintiff must present facts showing that the defendant published a defamatory factual communication concerning the plaintiff that was false; that the defendant either knew it was false, or was negligent in determining whether it was false; that the persons receiving the communication understood that it was defamatory; and that the plaintiff's reputation was injured or harmed as a result of the published defamation. *See* SCRA 1986, UJI 13–1002. "Defamatory communications are those which tend to ... harm the person's reputation...." SCRA 1986, UJI 13–1007. Because Plaintiff is not a public figure, he must only present facts showing that the "defendant must have been negligent when defendant published the communication. The defendant must have negligently failed to check on the truth or falsity of the communication prior to publication." SCRA 1986, UJI 13–1009(B); *Marchiondo v. Brown*, 98 N.M. 394, 402, 649 P.2d 462, 470 (1982).

 Defendants contend that the false statement that Gila Regional's decision to take adverse action was predicated on the results of an outside review is not defamatory because the statement did not render him "contemptible or ridiculous ... or expose him to public hatred or contempt or hinder virtuous men from associating with him," quoting a New Mexico Court of Appeals opinion that is distinguishable on its facts. Doc. 160 at 46. But Defendants ignore that harm to *professional* reputation does not also require a finding of moral contempt or ridicule, and as the New Mexico UJI disjunctively states, a defamatory communication is also one that tends "to harm the person's reputation." SCRA 1986 UJI 13–1007. Clearly, a false statement that Gila Regional's decision to take adverse action was supported by the expert opinion of an outside reviewer gives greater credence to that decision when a prospective employer reads the explanation for the adverse action, and harms the physician's professional reputation. Defendants next contend that Dr. Remillard's failure to check the box stating that Plaintiff disputed Gila Regional's action cannot be considered a statement, much less a defamatory statement. But the adverse report states that, "unless one or more boxes below are checked, the subject of this report ... has not contested this report." Doc. 44–1 at 4. Dr. Remillard's failure to check the box resulted in an affirmative statement that Plaintiff did not contest the report and the defamatory implication that Plaintiff did not dispute the "facts" presented therein, which, again, gives more credence to the propriety of Gila Regional's action and increases the damage to Plaintiff's professional reputation. After all, if Plaintiff did not contest the statements made in the adverse report or that the adverse action was proper, who would? Finally, Defendants argue that, as a matter of law, Plaintiff cannot prove that these two defamatory statements caused his damages. Doc. 160 at 46. But, as

Plaintiff points out, Plaintiff also contended that Dr. Remillard falsely stated that he had "substandard and inadequate skill levels," posed an "immediate threat to health and safety," and "substandard and inadequate care" when there has never been a final finding made by an expert, the Board, the MEC, or the FHC that, in fact, Plaintiff fell below the standard of care or that he is so incompetent that he poses an "immediate threat to health or safety." Doc. 162 at 23. As reflected by my previous Opinions, Plaintiff has established as a matter of law that Dr. Remillard defamed him by publishing false facts about his suspensions to the New Mexico Medical Board and to the National Practitioner's Data Bank and that Dr. Remillard was at least negligent in failing to determine whether they were false. As noted previously, contrary to his publication to the Medical Board that Plaintiff had twice been suspended, both suspensions had automatically expired by operation of the Bylaws because of the MEC's failure to follow procedure by informing Plaintiff of the specific cases it was concerned with and giving him an opportunity to explain or answer questions about his medical care, and Dr. Remillard was aware of those failures. *See* December 21, 2012 Opinion at 13; March 27, 2012 Opinion at 18 ("When asked by the FHC panel why Plaintiff was not given the opportunity to provide input during the whole peer-review process, Dr. Remillard attempted to justify the failure to do so by stating 'we have enough evidence to support those actions....'"); Doc. 160–6 at 1 (minutes of Nov. 17, 2008 MEC meeting noting that summary suspension procedures were reviewed and that Dr. Remillard would inform Plaintiff of the suspension); Doc. 57, Ex. 1 (letter/notice to Plaintiff signed by Dr. Remillard referring only to "two [unspecified] diagnostic laparoscopi[c] procedures recently performed by you," informing him that

"[t]hese incidents will be investigated by the Peer Review Committee," and referring to the Bylaw's procedures for summary suspension).

As noted in my March 27, 2012 Opinion, however, Dr. Remillard will be entitled to qualified immunity under HCQIA on the defamation claim unless a jury finds that he "knew it was false." March 27, 2012 Opinion at 33.

### E. Defendants are entitled to summary judgment on Plaintiff's state-law claim for malicious abuse of process.

 In a malicious abuse of process claim, a claimant must establish three elements: "(1) the use of process in a judicial proceeding that would be improper in the regular prosecution or defense of a claim or charge; (2) a primary motive in the use of process to accomplish an illegitimate end; and (3) damages." *Durham,* 2009–NMSC–007, ¶ 29, 145 N.M. 694, 204 P.3d 19. The first element—misuse of process—can be shown in one of two ways: "(1) filing a complaint without probable cause, or (2) an irregularity or impropriety suggesting extortion, delay, or harassment." *Id.* (internal quotation marks and citation omitted).

*LensCrafters, Inc. v. Kehoe,* 282 P.3d 758, 766 (N.M.2012). Plaintiff has failed to present any facts showing that the Defendants filed or instigated a complaint against him in a judicial proceeding. Therefore, Defendants are entitled to summary judgment on this claim as a matter of law.

**IT IS ORDERED** that Defendants' motion to dismiss [Doc. 123] is DENIED; that Defendants' motion for summary judgment [Doc. 168] is DENIED; that Defendants' cross-motion for summary judgment is GRANTED as to Plaintiff's

state-law claims for intentional infliction of emotional distress and defamation as against Dr. Koury and Don White, and GRANTED as to Plaintiff's state-law claims against all Defendants for malicious abuse of process; and that Plaintiff's motion for summary judgment [Doc. 135] against Dr. Remillard, Dr. Koury, and Don White is GRANTED as to his claims for violation of § 1983 and GRANTED as to his state-law claim for defamation against Dr. Remillard.